877 So.2d 1123 (2004)
STATE of Louisiana
v.
Kortney T. SMITH.
No. 04-KA-199.
Court of Appeal of Louisiana, Fifth Circuit.
June 29, 2004.
*1125 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Juliet L. Clark, Vincent Paciera, Jr., Thomas S. Block, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Jane L. Beebe, Gretna, LA, for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY and MARION F. EDWARDS.
MARION F. EDWARDS, Judge.
Defendant Kortney T. Smith appeals his conviction and sentence for second-degree murder. We affirm.
At 4:30 a.m. on October 30, 2001, seven-month-old infant Kortney Smith died after sustaining a depressed skull fracture and brain hemorrhage while in the care of his father, the defendant Smith. Smith was indicted by a Jefferson Parish grand jury for the second-degree murder of the infant in violation of LSA-R.S. 14:30.1. Smith pled not guilty at arraignment. After a hearing, the trial judge denied Smith's motions to suppress his statement and the evidence.
Following trial before a twelve-person jury, Smith was found guilty as charged. He was subsequently sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence to be served consecutively with an unrelated sentence. Smith appeals.
At the trial, the child's mother, Trekisha Sanders, testified that at the time of this incident, she was living in Harvey with Smith and her three children, Trey, Trey Juan, and the victim, Kortney. Smith was Kortney's father. On Monday, October 29, 2001, the day preceding the child's death, Trekisha left for work at 8:45 a.m. Trey went to school, and Smith stayed home with Kortney and Trey Juan. According to Trekisha, baby Kortney was sleeping in the upstairs bedroom and although he had a cold, he was breathing with no difficulty.
Trekisha called home twice that day. When she called at approximately 10:00 a.m., Smith told her Kortney was awake and crawling around. When she called at 3:30 p.m., Smith related that the children were fine. Trekisha went home at approximately 6:00 p.m. to bring the family some supper. Smith told her that the children were upstairs, but she did not actually see them, staying only for five or ten minutes before returning to work. Smith told her that he was bored and wanted to go out and take a ride. Later that evening, Smith called her at work to tell her that Kortney was choking and turning blue. When she arrived home, her aunt was holding the baby and rocking him. A friend from work, who had driven her home, carried the baby to the ambulance. At that time, Kortney told her that he had been feeding the baby when he turned blue, and Kortney never said anything *1126 about the child falling down the stairs. At the hospital, she found out the baby had head fractures and telephoned Smith, who had gone home. He told her that he did not know how the baby may have been injured. After he had been arrested, Smith stated that the child had fallen down the stairs, but that he had been afraid to tell her.
Deputy Carl Quijano of the Jefferson Parish Sheriff's Office was dispatched to Smith's residence at approximately 7:07 p.m. Deputy Quijano saw Carolyn Sanders, Trekisha's aunt, holding and rocking the child. According, to Deputy Quijano, the child appeared to be "lifeless." The child's arm was "dangling," he was breathing sporadically, and Deputy Quijano could not find the child's pulse. According to Deputy Quijano, Smith identified himself as "Wayne Washington" and said that he was a friend of the family, helping to take care of the child for their mother, Trekisha. Sanders related that the child began to choke while Smith was feeding him milk. When Kortney stopped breathing, the two attempted to revive him by patting him on the back and by shaking him. Deputy Quijano testified that Sanders initially provided the history, but that Smith repeated what she had said. Smith added that he had attempted to give the child CPR.
At the hospital, Homicide Detective Donald Meunier spoke to Carolyn Sanders and Smith, who still identified himself as "Wayne Washington." According to Detective Meunier, Smith told him that the child had choked, but did not mention that the child had fallen down the stairs or hit his head. Detective Meunier asked Sanders and Smith to stay where they were while he went to check on the child's condition. However, both Sanders and Smith were gone when the officer returned.
Detective Meunier asked some follow-up questions of the other family members, and returned to the detective bureau. At approximately 12:30 a.m. on October 30, 2001, Detective Meunier spoke to Sanders at the bureau, where she went voluntarily. In her first taped statement at 4:51 a.m., Sanders, who lived across the street from Smith, said that a neighbor summoned her to Smith's residence when the child started choking. However, she did not provide additional information relative to the child's injuries. Sanders acknowledged that Wayne Washington was not Smith's real name, and that Trekisha and Smith had asked her to identify him as such. She told the police that the last time she babysat the child was either Friday (October 26th) or Saturday (October 27th), pursuant to Smith's request.
At the conclusion of the recorded statement, Detective Meunier told Sanders that the child's choking on a bottle did not explain his injuries and death. At 10:02 a.m., Sanders gave a recorded statement in which she admitted that she knew more about the child's injuries than she originally said. During this time, Sanders did not ask to leave, nor did Detective Meunier intimidate her or imply she would go to jail. The tapes and transcripts of both of Carolyn Sanders' statements were admitted at trial and the tapes were played for the jury.
In her second statement, Sanders stated that Kortney was holding the baby and telling him to shut up. He "popped" the baby, and it didn't sound like a slap, but rather like something hard. She saw him swing his arm, but did not see an object in his hand. Smith then went into the kitchen to get ice to put on the back of the baby's head. When Sanders asked why he was putting ice on the baby, Smith responded "because I slapped him, I hit him." Sanders left, returning when a neighbor summoned her because the baby was not breathing. Smith told her he was *1127 giving the baby a bottle when the child began to choke. She went to the hospital, but left after Smith did, to go home and change her clothes. Smith was at her home, along with her boyfriend and her nephew. Sanders asked him if he hit the baby with the skillet and he stated that he had. "He was still kind of out of it....", and was beginning to have a seizure.
At trial, Sanders testified that she often babysat with the children. She stated that on October 29th, 2001, Smith borrowed a skillet from her, and he appeared to be in a bad mood at the time. Sanders walked across the street to the house later in the day, and the door was ajar. She could hear Smith telling the baby to shut up, and he tapped the baby on the head. According to Sanders initial trial testimony, Smith did not hit the baby with anything. Then the State presented her with the second statement she had given to police on October 30, 2001.
Upon questioning at trial, Sanders admitted: "The truth's on the tape." She reiterated at trial that Smith admitted hitting the baby with the skillet. After she was summoned by the neighbor, Sanders tried to give the baby mouth-to-mouth resuscitation. When she got to the hospital, she gave the police a fake name for Smith, calling him "Wayne Washington." On cross-examination, she stated that her previous testimony, that Smith did not hit the child with an object, was a mistake, and the result of being tired.
Pierre Smith, who lived with Carolyn Sanders at the time, corroborated her testimony regarding Smith's admission about striking the child with the skillet. Pierre stated that Smith and Brad Bartholomew, Carolyn's nephew, came to Carolyn's house that night before Carolyn returned from the hospital. Pierre said he was upstairs when he heard Brad say that Smith had "caught a seizure," and Pierre ran downstairs and grabbed him. However, Pierre stated that he had calmed Smith down by the time Carolyn arrived, and that he did not appear to have any difficulty understanding Carolyn when she asked Smith if he had struck the child with the skillet. Additionally, Pierre testified that he was certain that he heard Smith reply affirmatively to Carolyn's question.
Dr. Aaron Thompson, a pediatric hospitalist, and Dr. John Steck, a neurosurgeon, examined the child in the emergency room. Dr. Thompson was accepted as an expert in pediatrics and Dr. Steck was accepted as an expert in neurosurgery. Dr. Thompson testified the family said that the child had choked on a bottle, and was shaken try to get the formula up. The baby then stopped breathing. Dr. Thompson considered the history to be vague, and it was inconsistent with the injuries the child had sustained, which Dr. Thompson described as severe.
The doctors found a large area of swelling and a depressed skull fracture in the right parietal occipital area of the child's skull. The fracture was palpable, that is, it could be felt with the fingers, and it was pushed in toward the brain. There was bruising behind the child's ear, and he exhibited signs of a severe neurological injury because he did not respond to pain and he was "posturing." Dr. Thompson explained that posturing is when the arms and legs are straightened out uncontrollably. Through the use of an ophthalmoscope, the doctors observed extensive retinal hemorrhages, which occur in the back of the eye when the blood vessels break. Dr. Thompson explained that retinal hemorrhages are pathognomonic, or specific, signs for "shaken baby syndrome." In fact, Dr. Thompson stated that one does not see retinal hemorrhages in any condition other than shaken baby syndrome. Dr. Thompson explained retinal hemorrhages are caused by the "force *1128 of going forward and back repetitively with very sharp acceleration and deceleration and actually rips the blood vessels and causes bleeding in the back of the eye."
The child was intubated, meaning that a tube had been placed down his throat into his lungs because he was not breathing on his own. Additionally, a tube had been placed in the child's stomach to prevent the accumulation of air or secretions. An interosseus needle, which is a needle inserted into the bone, was also in place because there had been difficulty with starting an I.V. Dr. Steck explained that the child had also suffered a subdural hematoma, which is bleeding under the dura, the outer covering of the brain. The doctors attempted to obtain further I.V. access because an interosseous line does not last very long. However, the child began to have problems with his heart rate, his heart failed, and the child became brain dead. According to the autopsy report, the child died at 4:30 a.m. on October 30, 2001.
According to both doctors, the injuries were not consistent with the history provided, and were not consistent with an infant choking on formula, falling out of bed, or falling down stairs. The police were notified of possible abuse, because of the nature of the injuries, which were signs that some type of severe trauma had occurred. The skull fracture was consistent with the child having been struck with an object such as a frying pan, and could not have been sustained by a slap on the back of the head. Further, the retinal hemorrhages are caused by repetitive shaking rather than one blow. The child could not have fallen down the steps fast enough to cause a depressed skull fracture, although such a fall can cause a simple linear fracture.
Dr. Steck testified that brain injuries such as those suffered by this infant do not occur absent a significant force. In his opinion, the child had more than one insult to the brain to cause that injury. To have a depressed skull fracture that is closed, one has to be hit by a large broad object at a significant force, such as in a car wreck or being thrown up against a wall. That type of event would not have caused the other brain injuries, which were consistent with a shaken baby.
Dr. Scott Benton, an expert in pediatric forensic medicine, testified that he had reviewed the child's medical records, the autopsy protocol, Dr. Bhattacharjee's report, the defendant's three statements, photographs of the scene and photographs of the child, both prior to his death and post-mortem. According to Dr. Benton, the important finding was the injury to the axon, or nerve system. Dr. Benton explained that under accelerating, decelerating conditions, the brain develops cracks that tear the nerves with it, causing "diffuse axonal injury." Dr. Benton explained that it is a specific type of brain injury that is seen with trauma.
Dr. Benton explained the type of forces that caused the child's injuries:
There's two things going on. There is impact trauma, which is manifest by the skull fracture, the hematoma that's noted on the scalp, or the blood hemorrhage or bruise, if you will, that's on the scalp. That's impact trauma. Something hit the head very hard, or the head was accelerated very fast against something. That's what that tells you. And it was focal trauma, meaning it wasn't diffuse in that instance. At that point it was focal. It was a concentrated amount of force to that part of the skull.
The second aspect is that there is not diffusion of that force but diffusion of a another force that caused the hemorrhages in the eyes, to the optic nerve sheath and to the rest of the brain in what is seen as diffuse axonal injury. *1129 The impact to the skull  and let me be clear about this  did not propagate the force to the other side of the brain or to that other optic nerve sheath. That was a second force that was applied to this child's brain; and that's an acceleration, deceleration, or, in layman's term, a shaking force, at least in the environment that I've been described. The only other time that we see this is in massive motor vehicle accidents 
Considering the type of damage sustained, Dr. Benton believed it most unlikely that if the baby fell, that he would have been crying for a couple of minutes, because there is an immediate change in the level of consciousness after a traumatic injury. A blow with the skillet could have caused the skull fracture and bruising, but would not have caused the other injuries.
Dr. Susan Garcia, a forensic pathologist with the Jefferson Parish Forensic Center, testified that the autopsy on the child had actually been performed by Dr. Rudner, who was no longer employed with the Forensic Center. The autopsy report reflected that Dr. Rudner found that the child's cause of death was multiple blunt force traumatic head injuries. Additionally, Dr. Rudner found . 3 centimeter bruise on the left upper cheek area, a .5 centimeter bruise behind the right ear, and a .7 centimeter bruise in the midline of the scalp. When the scalp was removed, there was blood in the soft tissue covering the bone. Further examination revealed a 7 centimeter depressed semicircular skull fracture, a 5 centimeter linear fracture radiating from the depressed fracture, and a 1.5 centimeter fracture in the middle of the skull. Once the skull cap was removed, Dr. Rudner discovered the brain was swollen and saw bleeding under the membranes covering the brain. Dr. Rudner also noted perioptic nerve hemorrhage, which is blood in and around the nerve connecting the eye to the brain.
In Dr. Garcia's opinion, the injuries could not have been caused by a child falling down five or six carpeted stairs, but are consistent with a blunt force trauma to the back of the head.
Dr. Rudner removed the child's brain and sent it to Dr. Meena Bhattacharjee, a pediatric neuropathologist at Texas Children's Hospital. Dr. Bhattacharjee testified that she found moderate to severe diffuse brain swelling. There was also multifocal, subarachoid hemorrhage that was most prominent in the right, parietal occipital region consistent with the site of the associate depressed skull fracture. According to Dr. Bhattacharjee, the hemorrhage was of recent origin. Dr. Bhattacharjee used State's Exhibit 12, a photograph of the child's brain, to illustrate the difference between the normal left hemisphere and the injured right hemisphere. Dr. Bhattacharjee stated that the photograph showed the subdural blood, which was the blood clot, and the subarachnoid blood, which was the more diffused red stain. These injuries are not consistent with a fall, and it is unlikely to have been caused by a slap with an open hand, but rather the result of severe trauma.
Detective John Drury testified that he, Detective Meunier, and Detective Clogher, responded to the call received from the medical center. At 11:14 a.m. on October 30, 2001, Detective Drury obtained a warrant for Smith's arrest and a search warrant for his apartment. The fact that Smith was wanted by the police was broadcast on the evening news. At approximately 7:45 that night, Smith showed up at the detective bureau and made several recorded statements to Detective Drury after waiving his constitutional rights. The tapes and transcripts of all three statements were admitted into evidence and the tapes were played for the jury. During *1130 the time Detective Drury spoke with him, Smith was calm.
In the first statement, Smith described the events of the day leading up to the child's having difficulty breathing. Sidney Bartholomew had come over earlier in the day to use the telephone. Carolyn came over between 1:00 and 2:00 that afternoon. The baby had a runny nose, but was not sick. Later, Sidney's brother Brad came over, and Smith took the children for a ride with Brad before waiting for Trey's bus, which usually arrives at 4:30 p.m. According to Smith, Kortney was asleep in his playpen downstairs at 5:15 p.m. Smith placed the child on a pallet on the floor upstairs in the master bedroom to sleep. At 6:30 p.m., he heard the child crying and went upstairs to change his diaper. He returned downstairs to warm a bottle for the child. When he fed the child the bottle, however, the baby began to choke and to have difficulty breathing. He patted the child on the back, tried CPR, called the ambulance, and yelled to a neighbor who was outside to summon Sanders.
Smith said that he went to the hospital, giving the police a false name of Wayne Washington, but left when Trekisha told him to go. He went with Brad to a number of different places, including Brad's girlfriend's residence, where they spent the night. The family had Brad's beeper number, and would page them when there was any news. Brad went to the hospital the following morning. When Brad returned, he told Smith that the child was dead. Brad told Smith that Trekisha's mother was blaming him (Smith), and that he (Smith) later went to his family home.
Detective Drury continued to question Smith. Shortly before his second recorded statement at 4:41 a.m. on October 31, 2001, Smith said for the first time that the child had fallen down the stairs. In his second statement, Smith stated that he had not told the truth the first time about what happened after he brought the child upstairs. According to Smith, he brought all the children upstairs and closed the door, going downstairs to fix something to eat. He surmised the other children must have opened the door and the baby crawled out of the room. After hearing a thumping sound on the steps, Smith discovered Kortney six or seven steps from the top of the staircase, with his head facing down. The other children were at the top of the stairs. According to Smith, he was afraid to tell anyone that the child had fallen because he was embarrassed that he had let the accident happen.
In the third statement, Smith added that he had forgotten to tell Detective Drury that he had stopped by Sander's apartment after leaving the hospital. According to Smith, Carolyn was entering her residence as he and Brad were leaving. Smith admitted that he spoke to Carolyn, but could not recall what he said.
At trial, Smith testified that none of the children were ever mistreated. He denied that he slapped or hit Kortney at any time. Smith said that he stayed home to take care of the children while Trekisha was at work. On the day in question, he and Sidney Bartholomew went to Carolyn's to borrow a skillet to fix some pancakes. After eating, Sidney left. Carolyn came over between noon and 1:00 p.m. to borrow some sugar. The next time Smith saw Carolyn was when she came over to help after Kortney started choking. He denied that Carolyn said anything to him about hitting Kortney and denied he applied ice to Kortney's head that day.
According to Smith, the children did not have any accidents or any problems before Trekisha came home at 6:00 p.m. Kortney was placed on a pallet upstairs on the floor in the room, and Smith closed the door. The pallet where he placed the child was approximately three to four feet from the *1131 staircase. Approximately thirty-five minutes after Trekisha returned to work, he heard Kortney falling down the stairs. Smith testified that the child was crying, but he did not see any signs that the child was injured. According to Smith, the child was near the bottom of the stairs, but did not actually hit the bottom. The other children came downstairs after Kortney fell. Smith stated that he fed the child a bottle to calm him down, but the child began choking, the milk was coming out of the child's nose and mouth, and he was having difficulty breathing. Smith shook the child, attempted CPR and called for a neighbor to summon Carolyn. He called 911 as well as Trekisha.
Smith rode to the hospital with Brad because he could not get in the ambulance. He told the police that he was "Wayne Washington" because he was wanted for "serious charges" and feared he would be taken to jail. Smith left the hospital after Brad said that he heard a police officer say that everything was alright. When Brad repeated to Smith what he had heard, however, the officer denied that she had made the remark, and a verbal altercation ensued. The family told Smith and Brad they could leave, and that they would page Brad with any news. Smith stayed at the hospital for two hours, but left because he feared he would go to jail on outstanding charges.
According to Smith, the family paged Brad at 11:00 p.m. and again at 2:30 a.m., but there was no additional news. The next morning, Brad brought his children to school and then went to the hospital. When Brad returned home at approximately 9:00 a.m., Brad told Smith that Kortney had died.
Smith acknowledged that he went to Carolyn's house after leaving the hospital, but said that Carolyn did not tell the truth in her second statement to the police. Smith went to talk to the police after he saw the news reports that he had hurt Kortney, and he was very upset because the reports were untrue. Smith reiterated that he did not tell anyone that Kortney fell down the stairs because he was ashamed that he left him unsupervised. He further testified that he had pled guilty to attempted possession with intent to distribute cocaine in 1999, and he also pled guilty to two counts of possession of cocaine and two counts of possession of a firearm by a convicted felon.
Smith's aunt, Deidre Cleggett, and his mother, Janice Goods, testified that Smith had a close relationship with Kortney, and that they had never known him to abuse the baby. Smith also called Trekisha as a witness in his case. She testified that Carolyn Sanders never told her that she saw Smith strike Kortney. Trekisha further testified that she had previously believed that Kortney's death was an accident, and that Trey Juan told her the baby had fallen down the stairs.
Smith contends that the evidence is insufficient to support his conviction because the only direct evidence of his guilt was recanted by Carolyn Sanders at trial and that the circumstantial evidence did not exclude the reasonable possibility that the child fell down the stairs.
We review the issue of sufficiency by determining whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.[1] The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in *1132 order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. This is not a standard separate from the Jackson rule, but provides a helpful methodology for determining the existence of reasonable doubt.[2] In assessing other possible hypotheses in circumstantial evidence cases, the appellate court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events.[3] Instead, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under the Jackson standard.[4]
Smith was convicted of second degree murder, a violation of LSA-R.S. 14:30.1, which provides in pertinent part:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
....
(2)(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.
In order to convict a defendant of second degree murder pursuant to La. R.S. 14:30.1(A)(1), the state must prove (1) the killing and (2) specific intent to kill or to inflict great bodily harm.[5] Specific criminal intent is "that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). The determination of specific criminal intent is a question of fact and may be inferred from the circumstances and the actions of the defendant.[6]
In order to convict Smith of second degree murder pursuant to La. R.S. 14:30.1(A)(2)(b), the State must prove that Kortney's death occurred while Smith was engaged in the perpetration of cruelty to juveniles. Cruelty to juveniles is defined in LSA-R.S. 14:93(A) as "the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." The term "intentional" within the meaning of this statute, requires general criminal intent to cause a child unjustifiable pain and suffering.[7] Mistreatment as used in this statute means "abuse."[8] To be criminally negligent in his mistreatment or neglect of the child, the defendant must have such disregard for the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.[9]
*1133 Smith urges that other than the testimony of Sanders and Pierre Smith, there was no evidence to indicate the injuries were anything other than a tragic accident. We disagree.
Although Smith asserts that Dr. Bhattacharjee testified that the child's bruises were not consistent with being hit on the head with a frying pan, the record does not support this allegation. When asked about whether being struck by a frying pan could have caused the bruise behind the child's ear, Dr. Bhattacharjee replied, "Not in my opinion, but I'm not entitled to comment about that." Additionally, while Smith avers that Dr. Bhattacharjee could not say that the child's injuries were inconsistent with the baby's head hitting a wall, the record reflects otherwise. When defense counsel showed Dr. Bhattacharjee State's Exhibit 8, which is a photograph of the bruise on the top of the child's head, and asked whether the doctor could rule out the possibly that the impact of a corner of the wall caused it, Dr. Bhattacharjee replied negatively. Thus, the context of Dr. Bhattacharjee's testimony indicates that she could not rule out the corner causing the bruise, not the totality of the child's injuries.
None of the experts believed that the injuries to Kortney could have been caused by falling down the stairs, choking, or CPR. Dr. Bhattacharjee testified that she did not believe the injuries were consistent with rolling down carpeted stairs, falling out of bed, or patting a choking child on the back. Dr. Garcia also testified that the child's injuries were not consistent with such a fall. According to Dr. Thompson, it is rare to see a skull fracture caused by a fall down the stairs. When asked by defense counsel whether he could rule out the possibility that the child's head struck the corner, Dr. Thompson replied, "From a fall down the stairs. I mean if someone took the child and smashed his head into the corner, then I suppose it could cause that." According to Dr. Thompson, shaken baby syndrome could not have been caused by thumping down twelve or thirteen steps or by shaking a child to attempt to revive it.
Similarly, when shown the photograph of the stairs in the Smith's apartment, Dr. Steck opined that there was "no way" that the child's injuries could have been sustained by falling down those stairs. Further, Dr. Steck testified that he could not conceive of any physical properties of stairs that could cause these types of injures. Dr. Benton testified that nothing on the stairway in Smith's apartment could have accidentally caused the child's injuries. According to Dr. Benton, even if the child had fallen down the stairs, he would not have gone more than a couple of steps, and the injuries could not have been caused even if he had fallen all the way to the bottom. Dr. Benton had never seen a fatality from a stairway fall. According to studies discussed by Dr. Benton, the older children fell down stairs further than younger children because older children have more mass than younger children. Further, Dr. Benton opined that the "conclusion was that if you see significant trauma on the order of what we're seeing here, then you're not dealing with a stairway injury." Finally, Dr. Benton explained that shaken baby syndrome is not caused accidentally, and is indicative of abuse, regardless of what explanation is tendered. Based on the foregoing, we find the experts negated the possibility that a fall down the stairs in Smith's apartment could have caused the child's injuries.
Smith also contends that Sanders credibility was suspect, and that she recanted the only direct evidence in the case. Rather, the record reflects that although Sanders initially testified that Smith merely tapped the baby, she later acknowledged *1134 that her final statement to the police was the truth. In addition, Pierre Smith corroborated Sanders' testimony regarding Smith's admission.
Smith's explanation for the child's injuries was that the child had fallen down the stairs. In returning the guilty verdict, the jury obviously rejected this hypothesis of innocence. "When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt."[10] It is the role of the fact-finder to weigh the respective credibility of the respective witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review.[11]
After considering all of the evidence, direct and circumstantial, we find that a rational trier of fact could have reasonably rejected Smith's version of events and concluded beyond a reasonable doubt that, at the very least, Kortney died at the hands of Smith while the latter was engaged in the perpetration of cruelty to juveniles. This assignment of error has no merit.
Smith also claims that the trial judge erred in failing to either admonish the jury or grant a mistrial after the prosecutor made an improper remark in rebuttal.
Smith objected after the prosecutor made the following remarks during rebuttal:
He's no father, he's not a real man. He is a cold-blooded, angry, controlling, manipulative murder.
You go back there, you take your vote. Ten out of twelve, Mr. Regan's going to tell you don't change your vote, don't listen, don't do this, don't argue, don't talk. You go back there, you look at the evidence, take the photographs, ask for the photographs to go back there.

That is a cold-blooded, calculating murderer who still hasn't got a clue. He doesn't deserve to be on our streets. Take him off our streets forever. Don't let him do that to somebody else. (Emphasis supplied)
Thereafter, Smith objected and asked for an admonition. The trial judge responded that he was about to read the jury charges and these instructions would advise the jurors how they should consider the arguments of the attorneys. The record reflects that the court told the jury that the opening statements and closing arguments were not to be considered as evidence and that the jury should not be influenced by either sympathy or prejudice.
After the court announced that the jury had reached a verdict, Smith argued that the court's instructions were insufficient to cure the prejudice caused by the prosecutor's remark and moved for a mistrial, which the court denied. The court noted that it had instructed the jury several times during the trial that the words of the attorneys were not evidence and that the full instructions immediately after the objection remedied the situation.
LSA-C.Cr.P. art. 774 defines the scope of argument and rebuttal:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or *1135 defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant.
LSA-C.Cr.P. art. 771 provides that the trial judge shall promptly admonish the jury upon request of the State or the defendant when a prejudicial remark is made during trial or argument when a mistrial is not mandatory under LSA-C.Cr.P. art. 770. Further, the article provides that the court may grant a mistrial if it is not satisfied that the admonition was sufficient to assure a fair trial for the defendant. However, a mistrial is a drastic remedy and, except in instances that a mistrial is mandatory, is warranted only when the defendant suffers substantial prejudice that deprived him of any reasonable expectation of a fair trial.[12]
Nevertheless, prosecutors have considerable latitude in making closing arguments, and even when a prosecutor has exceeded that latitude, a conviction will not be reversed unless the reviewing court is "firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict."[13]
In the present case, we find that the prosecutor's remarks, although arguably improper, were not so inflammatory as to warrant reversal. We are not firmly convinced either that the jury was influenced by the remarks or that they contributed to the verdict. The prosecutor's remarks were harmless in light of the evidence against Smith, and because of the trial court's specific instructions to the jurors that the arguments of attorneys were not evidence.
This assignment of error has no merit.
Smith also complains that the trial court improperly ordered his life sentence to be served consecutively with a five-year sentence for unrelated charges. However, Smith did not file a written motion to reconsider sentence, nor did he object to the trial court's order that the sentence would be consecutive. Further, he does not contend on appeal that his life sentence was constitutionally excessive. Thus, he is precluded from challenging as excessive the consecutive nature of his sentence.[14]
The record was reviewed for errors patent, and find none that require corrective action on the part of this court.
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tilley, 99-569 (La.7/6/00), 767 So.2d 6, 24, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001).
[2] See State v. Jones, 98-842 (La.App. 5 Cir. 2/10/99), 729 So.2d 57, 63.
[3] State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).
[4] Id.
[5] State v. Williams, 97-1135 (La.App. 5th Cir.5/27/98), 714 So.2d 258, 263.
[6] State v. Sandoval, 02-230 (La.App. 5 Cir. 2/25/03), 841 So.2d 977, writ denied, 03-853 (La.10/3/03), 855 So.2d 308.
[7] See, State v. Richthofen, 01-500 (La.App. 5 Cir. 11/27/01), 803 So.2d 171, 184, writ denied, 02-0206 (La.1/31/03), 836 So.2d 57, and the cases cited therein.
[8] Id.
[9] State v. Richthofen, supra (citing State v. Porter, 99-1722 (La.App. 3d Cir.5/3/00), 761 So.2d 115, 123).
[10] State v. Captville, 448 So.2d 676, 680 (La.1984).
[11] State v. Wallace, 00-1745 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297.
[12] State v. Harris, 00-3459 (La.2/26/02), 812 So.2d 612, 617.
[13] State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 375, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).
[14] La. C. Cr. P. art. 881.1; State v. Watson, 02-1154 (La.App. 5 Cir. 3/25/03), 844 So.2d 198, 212.