900 So.2d 26 (2005)
STATE of Louisiana
v.
Joseph GLENN, IV.
No. 04-KA-526.
Court of Appeal of Louisiana, Fifth Circuit.
March 1, 2005.
*28 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Juliet Clark, Kia Habisreitinger, David Wolfe, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Dennis K. Dolbear, and Arthur L. Harris, Sr., New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS and WALTER J. ROTHSCHILD.
MARION F. EDWARDS, Judge.
Defendant, Joseph Glenn, IV, appeals his conviction for second degree murder of a known juvenile. For the following reasons, defendant's conviction is affirmed.
On December 6, 2001, defendant, Joseph Glenn, IV, was indicted by a Jefferson Parish grand jury for the second degree murder of a known juvenile in violation of LSA-R.S. 14:30.1. Glenn pled not guilty at arraignment. After a hearing, the trial judge denied defendant's motions to suppress his confession and the evidence. Writs on these rulings were denied by this Court and by the Louisiana Supreme Court.
Trial commenced on March 17, 2003, before a jury, which found Glenn guilty as charged three days later. On April 10, 2003, Glenn was sentenced to life imprisonment *29 at hard labor without benefit of parole, probation, or suspension of sentence. Glenn timely filed the present appeal.
Victoria Glenn, daughter of Joseph Glenn, IV and Nicole Vinet, was born on September 21, 2001. Nicole Vinet testified that Victoria was healthy at birth and, except for a little reflux, she was fine at both her two-week and one-month check-ups. Two-month-old Victoria died at 5:01 a.m. on November 26, 2001, with her death classified as a homicide secondary to child abuse.
On November 24, 2001, Glenn kept Victoria while the child's mother went to work. Although Glenn was living with Vinet at the time, Glenn was going to watch Victoria at his mother's house, because he had custody of his three-year-old son, Kevin, that weekend. Vinet testified that she did not realize that Glenn was also going to have custody of his five-month-old daughter, Veronica, a daughter about which she was unaware. On that day, at approximately 9:00 a.m., Vinet met Glenn at the Aspen Clinic to exchange custody of Victoria. Vinet testified that Glenn was a good father and she trusted him with her child.
Glenn stated that the child was normal when he received custody of her from her mother. He then contends that he placed her in the video room to watch television in her car seat next to the sofa. Glenn testified that, because Victoria was spitting up, he set the car seat erect. According to Glenn, he and Kevin were watching a cartoon and teasing each other when he reached for a toy and lost his balance while wearing socks. Glenn alleges that his foot hit the carrier from the back side and, simultaneously, Kevin ran into the carrier and knocked the infant seat over. Glenn further testified that he knocked the car seat off of Victoria and picked her up. Glenn noticed she was not breathing, performed CPR, and called 911 twice. Glenn testified that after the fall, he reacted and shook Victoria to revive her when she failed to cry or make a sound.
At approximately 12:44 p.m. on November 24, 2001, paramedics Phil Alimia and Andy Vaccaro responded to the 911 call and arrived at 1318 Lake Frances Drive in Harvey at 12:57. Lieutenant Gary Hargroder responded to the 911 call and arrived shortly thereafter. Glenn opened the door for the paramedics after a minute or so with the baby in his arms and placed her on the sofa. Victoria was not breathing and was blue; as a result, she was brought to the ambulance and the paramedics started to breathe for her, bagged her, and put a tube down her trachea. Initially, Victoria responded and "pinked up" and her pulse was found; however, her condition worsened. Lieutenant Hargroder assisted with chest compressions and rode in the back of the ambulance to Meadowcrest Hospital.
Phil Alimia testified of the importance to know the history of a patient in order to treat that patient. Glenn told him that he gave Victoria Tylenol to calm her down because she was cutting up. He never mentioned that she fell and hit her head or that he shook her, information that Phil Alimia would have wanted to know. Phil Alimia did not note any external injuries to the victim's head. Lieutenant Hargroder testified that he was given the same history from Glenn.
Raymond Gorman, a deputy with the Jefferson Parish Sheriff's Office, testified as to the history he was given at the hospital: Glenn had given Victoria Mylicon drops and then a few hours later, fed the baby and gave her Tylenol because she was whining. Because she turned blue shortly thereafter, Glenn called 911. Glenn never mentioned she fell and hit her head or that he shook her. However, *30 Glenn denies speaking to any officers at Meadowcrest Hospital.
Emergency Room physician Dr. An Nguyen treated Victoria at Meadowcrest Hospital when she arrived in cardio pulmonary arrest. She was not breathing and did not have vital signs. Although she was in critical condition, Dr. Nguyen was able to resuscitate her, re-intubate her and give her life support medications. Dr. Nguyen then ran basic blood work on Victoria and conducted a chest X-ray. She was not able to determine what caused the cardiac arrest and did not notice any external trauma to Victoria's head. Dr. Nguyen called Victoria's pediatrician to examine her. At this time, Victoria was stabilized and, although she was not breathing on her own, she had a heartbeat and vital signs.
Dr. Mark Allen Fisher, Victoria's pediatrician, testified that he saw Victoria for the first time after her birth on September 21, 2001, and then again while in the nursery. He later examined her at her two-week visit and then again for a one-month check-up. For all of these visits, Dr. Fisher testified that Victoria's eyes were normal and that she was in good condition. The next time Dr. Fisher examined Victoria was on November 24 at Meadowcrest Hospital after Dr. Nguyen called him. At this time, Victoria's eyes appeared abnormal and suspicious of retinal hemorrhages. Although other things were considered, these findings made him suspicious of possible abuse.
According to Dr. Fisher, a patient's history is probably the most important thing leading to a correct diagnosis. Dr. Fisher only knew that Victoria was fed, placed in her infant seat, and then fifteen minutes later an older sibling notified defendant that she was having difficulty breathing. At no time was he aware of Victoria falling out of the car seat and hitting her head on tile or that defendant shook the baby; however, he testified that knowing this history would have been helpful to him in his examination of Victoria. Dr. Nguyen testified that it is important to give the ER physician an accurate history. Glenn told Dr. Nguyen the child was cranky and so he gave her some Tylenol. When she turned blue and was not breathing, he called 911. At no time did Glenn mention to her the child fell and hit her head or that he shook her.
Once stabilized at Meadowcrest Hospital, Victoria was transferred to Children's Hospital. At Children's Hospital on November 25 at 8:00 a.m., Victoria was examined by Dr. George Ellis, Director of Ophthalmology at Children's Hospital. Dr. Ellis was accepted as an expert and testified as to his findings. According to Dr. Ellis, Victoria did not have a previous eye history or any known bleeding disorder. A cat scan of Victoria's head showed cerebral edema and bleeding in several different layers of the brain, including subarachnoid, subdural and interventricular hemorrhage. A healing rib fracture was also noted. With this background information, Dr. Ellis conducted an eye examination and noticed her pupils were dilated and fixed, which can be caused by cerebral edema. Victoria's eyelids were normal with no sign of bruising or hemorrhage. No hemorrhage was noted with the conjunctiva. Massive bleeding was found, however, in front of the retina. There was also extensive swelling and hemorrhage in the macula. Blood was also found in the vitreous. Dr. Ellis testified that hemorrhage was evident in both eyes. Dr. Ellis further testified that multi-layer bleeding in the eye's posterior indicates very severe head trauma and explained "shaken baby syndrome," and Victoria was diagnosed with shaken baby syndrome retinopathy.
*31 Dr. Kenneth James Ward, Head of Department of Radiology at Children's Hospital, was accepted as an expert and testified as to his findings. He reviewed CT scans and X-rays on Victoria and consulted with Dr. Benton. Dr. Ward testified that subdural hematomas do not occur when children fall from a height six feet or less, including a fall from a sofa onto a rigid floor. Dr. Ward noted blood in ventricles and was immediately concerned that this was a high velocity injury. Dr. Ward also found blood in the subdural and the subarachnoid spaces, and noted cerebral edema. Such injuries are consistent with high velocity trauma. After Dr. Ward saw no signs of external trauma and with the absence of appropriate history, he considered this child abuse. Dr. Scott Benton was notified of this. A skeletal survey of Victoria revealed she had healing posterior rib fractures, that is, she had been traumatized in the past, at least probably seven to ten days to two to four weeks before the injuries to her head occurred. In Dr. Ward's opinion, these fractures resulted from squeezing rather than resuscitation. Dr. Ward agreed that Victoria's injuries resulted from shaken baby syndrome.
Dr. Scott Benton, accepted as an expert in the field of forensic pediatric medicine, examined Victoria in the intensive care unit at Children's Hospital on November 25 and testified as to his findings. Dr. Benton's findings of multiple layers of hemorrhage were related to acceleration, deceleration injuries. The head has to move back and forth violently, as expected with shaking. Victoria had bilateral subdural hemorrhage, bilateral optic nerve sheath hemorrhage, retinal hemorrhage, and her fourth and fifth ribs were fractured. These rib fractures were estimated to be two weeks old by radiograph. Posterior rib fractures are not consistent with CPR, but are almost exclusive to child abuse, a grabbing around the chest. There was no evidence of impact trauma to the head or mid-face area. Dr. Benton testified that there was no doubt in his mind that Victoria was the victim of battered child syndrome.
Dr. Benton also testified as to the importance of an accurate history of a patient for treatment and diagnosis. At the hospital, Glenn told him that his son pointed out to him that Victoria was not breathing and then described his resuscitative efforts. The history given by Glenn to Dr. Benton was not consistent with his findings. Glenn never mentioned anything about Victoria falling from a car seat or that he shook the baby. However, Glenn denied speaking to Dr. Benton. Dr. Benton's diagnosis was inflected cerebral trauma, known as "'shaken baby syndrome.'" This, grouped with the older rib fractures, was defined as battered child syndrome.
Detective Donald Meunier of the Jefferson Parish Sheriff's Office Homicide Division received a call from Dr. Benton in reference to a child he examined in critical condition not expected to survive her injuries. Dr. Benton believed an investigation was necessary. Detective Meunier spoke to Glenn briefly at Children's Hospital, and Glenn agreed to accompany him and David Mascaro to the Criminal Investigation Bureau. Glenn was escorted to the interview room, filled out a Rights Form and was advised of his rights pursuant to an investigation for cruelty to a juvenile. Throughout this interview, Glenn gave five taped statements, all of which were admitted as evidence and played for the jury.
The first taped statement was at 11:54 p.m. At no time in this statement did Glenn mention the fall and how he shook the child. His first statement alleged that he fed Victoria, burped her and then placed her in her car seat next to the sofa. Kevin was watching television and defendant *32 was in the kitchen. Kevin later alerted him to Victoria's condition. When Glenn checked on Victoria, she was pale, starting to turn colors and was cold to touch. Glenn described his resuscitation efforts and stated that he called 911.
In the second statement given at 1:29 a.m. on November 25, Glenn stated that while he was in the kitchen, Kevin accidentally knocked Victoria out of her car seat which was on the floor next to the sofa. Glenn snatched her up from the ceramic tile, and she was not breathing so he started CPR.
Later at 2:06 a.m., a third statement was given in which Glenn admitted he and his son were playing and that he was sitting on the sofa teasing his son. He bumped the carriage with the back of his right heel, and then his son knocked her over onto the ceramic tile. Victoria was not strapped into her car seat. He picked her up and began CPR. He claimed he did not shake her at all.
A fourth statement was taped at 3:17 a.m. and added that the Glenn did shake the child after the fall to revive her. He admits he did not tell the doctor what happened out of fear of losing his children and going to jail.
A fifth and final statement was given at 5:35 a.m. which included Glenn's description of the shaking. He admits he was frustrated with Kevin and was shaking the child to wake her, but does not remember how many times he shook her when trying to treat her. Glenn admitted lying to physicians because he was scared for everybody to find out the truth. Detective Meunier described the shaking demonstrated by Glenn during the interview as an aggressive back and forth, vigorous and repeated shaking.
After the fifth statement, Glenn was booked with cruelty to a juvenile; however, he would be re-booked for second degree murder after Detective Meunier received information from Children's Hospital regarding the death of Victoria and talked to Dr. Traylor, the forensic pathologist that conducted the autopsy, and discovered her death was classified as a child abuse homicide.
Dr. James Glenn Traylor, Jr., accepted as an expert in the field of forensic pathology, performed an autopsy on two-month old Victoria on November 26, 2001, and testified regarding his findings. Dr. Traylor testified that he found three external contusions: one just to the inside of the left nipple, another below the collar bone, and another on the bottom of the jaw line. Such bruising is more consistent with grasping than with CPR; however, he could not exclude the possibility that the bruise on the shoulder could have resulted from a fall. There was no other bruising evident to the head area or scalp. He found petechial hemorrhage, pin point areas of hemorrhage over the heart's surface and on the subdural surface of the anterior lungs (disseminated intervascular coagulation). He noticed swelling of the brain and both subdural and subarachnoid hemorrhage. Retinal hemorrhages were likewise noted. Dr. Traylor also found healing rib fractures, seven to fourteen days old. A diffuse axonal injury was present.
Dr. Traylor further testified that this type of trauma is abusive head injury, previously referred to as shaken baby syndrome. This type of injury results from a violent shaking of a baby back and forth causing acceleration and deceleration injuries, tearing wire-like connections called axions and veins that run along the midline with blood running into the subarachnoid and subdural spaces. Victoria's diffuse axonal injury, subarachnoid hemorrhage, subdural hemorrhage, and retinal hemorrhages *33 are markers of shaken baby syndrome.
In his first assignment of error, Glenn contends that the evidence is insufficient to support his conviction because the case was based on circumstantial evidence and not every reasonable hypothesis of innocence was excluded. Glenn further argues that no serious contention was made that he intended to harm his child through intentional abuse or an uncaring indifference to the welfare of the child. The State responds that the evidence excluded every reasonable hypothesis of innocence and established all of the elements of the offense beyond a reasonable doubt.
In reviewing the sufficiency of evidence, an appellate court must determine whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.[1]
Under LSA-R.S. 15:438, "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." However, this requirement does not establish a standard separate from the Jackson standard, but provides a helpful methodology for determining the existence of reasonable doubt.[2] In assessing other possible hypotheses in circumstantial evidence cases, the appellate court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events.[3] Instead, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under the Jackson standard.[4]
Defendant was convicted of second degree murder, a violation of LSA-R.S. 14:30.1, which defines second degree murder as the killing of a human being provides in pertinent part:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
. . . .
(2)(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.
Specific criminal intent is "that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). The determination of specific criminal intent is a question of fact and may be inferred from the circumstances and the defendant's actions.[5]
*34 Cruelty to juveniles is defined in LSA-R.S. 14:93(A) as "[t]he intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." Within the meaning of this statute, the term "intentional" requires general criminal intent to cause a child unjustifiable pain and suffering.[6] As used in this statute, mistreatment means "abuse."[7] To be criminally negligent in his mistreatment or neglect of the child, the defendant must have such disregard for the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.[8]
Glenn asserts that there was no serious contention made that he intended to harm, much less kill, his child. However, LSA-R.S. 14:30.1(2)(b) provides that second degree murder is the killing of a human being when the offender is engaged in the perpetration of cruelty to juveniles, even without intent to kill or to inflict great bodily harm. Based on the evidence presented at trial, it appears that the jury reasonably determined that defendant's conduct amounted to a gross deviation below the standard of care expected from a reasonably careful person under like circumstances. Glenn admits that he did shake Victoria. Regardless of his reasoning or intentions, Glenn shook Victoria and, according to experts, this resulted in her death. Out of fear, Glenn failed to give an accurate history of the situation to paramedics and physicians who were trying to save his child's life.
Glenn also contends that it is not unreasonable to believe that his actions were ill-advised and taken in a moment of disorientation and panic, and were not as a result of an uncaring indifference to the welfare of his child. Glenn testified that he shook Victoria to revive her, not to hurt her. He contends that he shook her out of a shock reaction and did not realize how hard he was shaking her. Glenn stated that it was an accident. He testified that he is responsible for Victoria's death, but did not intend to do it.
The State's experts unequivocally discounted every reasonable hypothesis of innocence, including the possibility that the child fell out of her car seat and hit her head and then defendant shook her to revive her. Instead, the experts concurred that Victoria's injuries resulted from shaken baby syndrome.
Dr. Ellis testified that vigorous, severe shaking is necessary for the kind of hemorrhage present with Victoria. Her condition was not consistent with shakes to revive or a child falling from a car seat. Instead, according to Dr. Ellis, Victoria's condition was consistent with violent, repetitive shaking, that is, shaken baby syndrome. He believed that the condition of Victoria's eyes, by themselves, strongly suggest shaken baby syndrome. He testified that it is unlikely her condition could have been caused by CPR, seizures, or falls from small distances (two to ten feet).
Dr. Ward testified that his findings were not consistent with the history given by defendant. Glenn claimed he fed the child and the older sibling noticed she was not breathing. His findings were not consistent with the statement that the baby tumbled out of the car seat and hit her head or that he shook the baby to revive her. *35 There was no evidence of a soft tissue swelling that would indicate an impact, and no evidence of a skull fracture was present. Intercranial bleeds do not occur secondary to resuscitation. It was his opinion that Victoria suffered from shaken baby syndrome.
Dr. Benton testified that Victoria's injuries would not be caused by falling out of a car seat and hitting her head on carpet or ceramic tile, because her injuries were not translational event injuries or impact injuries. A shake to revive is not consistent with his findings. These types of injuries would not be caused by seizures, allergies, reflux or Tylenol. Although he believed it is possible for hemophiliacs to have subdural and subarachnoid hematomas, they do not have diffuse brain damage since the brain damage is a result of the forces and not a consequence of the bleeding.
Dr. Traylor testified that a simple injury caused by flipping out of a car seat involves translational forces and agreed that Victoria's injuries were not consistent with a shake to revive.
In addition, Paramedic Andy Vaccaro and Lieutenant Hargroder both testified that the bruises on Victoria's chest were not consistent with CPR compressions. Nicole Vinet testified she had no knowledge of previous rib injuries.
In the present case, Glenn's explanation of Victoria's injuries was that he shook her to revive her after she fell from her car seat. In returning the guilty verdict, the jury obviously rejected this hypothesis of innocence. "'When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.'"[9] It is the role of the fact-finder to weigh the respective credibilities of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review.[10]
After a review of the record, we find that the evidence in this case excluded every reasonable hypothesis of innocence. Thus, after considering all of the evidence, a rational trier of fact could have concluded beyond a reasonable doubt that the defendant was guilty as charged. Accordingly, we find this assignment to be without merit.
In his second assignment of error, Glenn claims that the State employed inflammatory and improper language during its closing argument when the State described the victim as "butchered" when in fact the child died as a result of shaking. The State responds that the defendant failed to object to the use of this term and, therefore, has failed to preserve this claim for appellate review. Despite this failure, the State responds that this claim lacks merit.
In closing arguments, the following remark was made by the State: "[w]e all hurt when a child is butchered in this way and justice is not brought about." After these remarks were made by the State, Glenn failed to object to the use of this term, and the trial judge was not asked to admonish the jury regarding the State's remarks. Nevertheless, the record reflects that the court told the jury that *36 closing argument should not to be considered as evidence, and that the jury should not be influenced by sympathy and prejudice.
LSA-C.Cr.P. art. 774 defines the scope of argument and rebuttal:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
LSA-C.Cr.P. art. 771 provides that the trial judge shall promptly admonish the jury upon request of the State or the defendant when a prejudicial remark is made during trial or argument when a mistrial is not mandatory under LSA-C.Cr.P. art. 770. Further, the article provides that the court may grant a mistrial if it is not satisfied that the admonition was sufficient to afford the defendant a fair trial. However, a mistrial is a drastic remedy and, except in instances where it is mandatory, is warranted only when the defendant suffers substantial prejudice that deprived him of any reasonable expectation of a fair trial.[11]
The record reflects that Glenn failed to make a contemporaneous objection to the State's remarks during closing argument. The contemporaneous objection rule provides that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."[12] The rule's purpose is to put the trial judge on notice of an alleged problem so that he may cure the problem, preventing defendants from gambling for favorable verdicts and then resorting to appeal on errors that could have been fixed had an objection been made.[13]
Jurisprudential exceptions to this rule exist, however, as demonstrated in State v. Rochon.[14] Statements made during a prosecutor's closing argument may be considered on appeal absent an objection at trial if the remarks made were "so extremely inflammatory and prejudicial that allowing the verdict to stand would seriously affect the fairness, integrity or public reputation of judicial proceedings."[15]
Prosecutors are allowed broad latitude in making closing argument, and even when a prosecutor has exceeded that latitude, a conviction will not be reversed unless the reviewing court is "thoroughly convinced that the remarks influenced the jury and contributed to the verdict."[16] The Louisiana Supreme Court has recognized that, even when the prosecutor's statements are improper, credit should be accorded to the good sense and fair-mindedness of the jurors who have heard the evidence.[17]
*37 Glenn now objects to the term "butchered" because of its overtones of cannibalism. However, even if the prosecutor's remarks were improper and no admonition was given to the jury, we do not find that the remarks influenced the jury and contributed to the verdict. The remarks at issue do not rise to a level of "extremely prejudicial and inflammatory" that would warrant reversal. Accordingly, we find this assignment to be without merit.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920, State v. Oliveaux,[18] and State v. Weiland.[19] The following matter is noted:
During sentencing, the trial judge stated that "[t]he statute under which the defendant was convicted provides for only one sentence and that is the sentence that the Court will impose; that is, the defendant will be sentenced to life in prison without the benefit of probation, parole or suspension of sentence." The Commitment, however, provides that the court sentenced defendant to imprisonment at hard labor for life. The Commitment further provides that the defendant is committed to the Louisiana Department of Corrections for execution of his sentence in conformity with LSA-R.S. 15:824. There is a mandatory sentence for second degree murder, and the trial judge specifically states the sentence he is imposing is the one provided for in the statute. However, the transcript reveals "at hard labor" was omitted in the sentence the trial judge imposed.
If a discrepancy exists between the minutes and the transcript, the transcript prevails.[20] Accordingly, we remand this case to the trial court for resentencing consistent with this opinion. In other respects, defendant's conviction is affirmed.
AFFIRMED.
NOTES
[1] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tilley, 99-569 (La.7/6/00), 767 So.2d 6, 24, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001).
[2] State v. Jones, 98-842 (La.App. 5 Cir. 2/10/99), 729 So.2d 57, 63.
[3] State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).
[4] Id.
[5] State v. Smith, 04-199 (La.App. 5 Cir. 6/29/04), 877 So.2d 1123, 1132 (citing State v. Sandoval, 02-230 (La.App. 5 Cir. 2/25/03), 841 So.2d 977, writ denied, 03-853 (La. 10/3/03), 855 So.2d 308).
[6] See, State v. Smith, 877 So.2d at 1132 and the cases cited therein.
[7] Id.
[8] Id.
[9] State v. Smith, 877 So.2d at 1134 (quoting State v. Captville, 448 So.2d 676, 680 (La. 1984))
[10] State v. Smith, 877 So.2d at 1134 (citing State v. Wallace, 00-1745 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297).
[11] State v. Smith, 877 So.2d at 1135 (citing State v. Harris, 00-3459 (La.2/26/02), 812 So.2d 612, 617).
[12] LSA-C.Cr.P. art. 841(A).
[13] State v. Hotoph, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1054, writs denied, 99-3477 (La.6/30/00), 765 So.2d 1062 and 00-150 (La.6/30/00), 765 So.2d 1066 (citations omitted).
[14] 98-717 (La.App. 5 Cir. 3/10/99), 733 So.2d 624
[15] Id. (citing State v. Hayes, 364 So.2d 923, 926 (La.1978); State v. Colligan, 95-880 (La. App. 3 Cir. 8/7/96), 679 So.2d 184, 189).
[16] State v. Amin, 02-916 (La.App. 5 Cir. 1/28/03), 839 So.2d 262, 270 (citing State v. Rochon, 733 So.2d at 630).
[17] State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, 846.
[18] 312 So.2d 337 (La. 1975).
[19] 556 So.2d 175 (La.App. 5 Cir.1990).
[20] State v. Lynch, 441 So.2d 732 (La. 1983).