945 So.2d 701 (2006)
STATE of Louisiana
v.
Joe GALLIANO.
No. 05-KA-962.
Court of Appeal of Louisiana, Fifth Circuit.
August 29, 2006.
*705 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Anne Wallis, David Wolff, Churita Hansell, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
*706 Ferdinand J. Kleppner, Metairie, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., CLARENCE E. McMANUS and JAMES C. GULOTTA, Pro Tempore.
CLARENCE E. McMANUS, Judge.

STATEMENT OF THE CASE
The Jefferson Parish District Attorney filed a bill of information charging the defendant, Joe Galliano, with second degree cruelty to a juvenile, a violation of LSA-R.S. 14:93.2.3. The defendant pled not guilty at arraignment.[1] After a hearing, the trial judge denied the defendant's motion to suppress his statement on September 16, 2002.
The defendant requested notice of any evidence the State intended to introduce under LSA-C.E. art. 404(B) and moved for a hearing on that evidence. The State noticed its intent to introduce evidence that the victim had sustained a spiral fracture of his femur while in the defendant's care several months before the charged offense. After a hearing, the trial judge ruled the evidence was admissible on October 11, 2002. The defendant sought writs to this Court, which reversed the decision of the trial court.[2] The State applied to the Louisiana Supreme Court, which reversed this Court's decision on January 10, 2003.[3]
On November 23, 2004, the defendant filed a motion in limine to exclude evidence of an incident that occurred to the victim's head when the defendant was removing the child from the defendant's vehicle on the day of the charged offense. The trial judge ruled that the evidence was admissible on November 30, 2004.
The trial before a twelve-person jury began on November 30, 2004 and lasted until December 3, 2004, when the jury returned a verdict of guilty as charged. The defendant filed a motion for new trial and a motion to recuse the trial judge before hearing the defendant's motion for new trial. Both motions were denied. After an extensive sentencing hearing, the trial judge sentenced the defendant to 40 years of imprisonment at hard labor on March 3, 2005. The defendant's motion to reconsider the sentence was denied. This timely appeal follows.

FACTS
On Wednesday, November 14, 2001, the defendant was babysitting two-year-old Christopher Cook, the son of the defendant's fiancée, Stacy Cook, at their residence at 2340 Missouri Street in Metairie. Sometime after 12:00 p.m., the child began having seizures and difficulty breathing. The defendant brought the child next door to his father's residence, where 911 was called and the child was taken to East Jefferson General Hospital. Later that afternoon, the child was transferred to Children's Hospital where he was treated by a number of physicians, including Dr. Scott Benton, who was accepted at trial as an expert pediatrician. The child was unconscious *707 and was on a ventilator. He was in critical condition and it was the consensus of the medical team that the child would probably die.[4] Dr. Benton reviewed East Jefferson's medical records on the child, which revealed that he had sustained a closed head injury without significant external trauma. The CAT scan showed subdural bleeding, which is blood in between the halves of the brain and under the membrane covering the brain. There was also evidence of cerebral edema, or brain swelling. Dr. Benton observed that the child was suffering retinopathy, or bleeding behind the eyes. Dr. Nadell, a pediatric neurosurgeon, was consulted to monitor the child's intracranial pressure, which was three times the normal level. He inserted a pressure monitor into the child's skull.
The Jefferson Parish Sheriff's Office was notified and Sergeant Kelly Jones of the Personal Violence Unit was one of the first responders to Children's Hospital. Sergeant Jones talked to the defendant while another officer interviewed Stacy Cook. After waiving his rights, the defendant agreed to answer Sergeant Jones' questions. He told the officer that, while playing with the family's new puppy, Christopher had wet his pants. Shortly thereafter, he began having a seizure. Defendant took the child to his father's house, which was nearby, where his father called 911.
The defendant also told Sergeant Jones that the child had been with James Cook, the child's grandfather, over the weekend in Independence, Louisiana. The defendant speculated that the child could have hurt himself when the child was in Mr. Cook's vehicle by himself and the vehicle rolled down an embankment. Because the physicians believed the child's condition was life threatening, Jefferson Parish Homicide Officers took over the investigation at the hospital.
Meanwhile, Sergeant Jones and another officer went to interview James Cook. At trial, Mr. Cook testified that he went to a local landfill with his son John, and Christopher on the Saturday preceding the incident. While Mr. Cook and John were disposing of the trash, Christopher slid over the seat in the El Camino and put the car in drive or in neutral. The car rolled four to five feet down a slight slope. Mr. Cook walked alongside the car until it stopped. Mr. Cook explained that Christopher was in a seatbelt, but could reach the gear shift because the El Camino had the old style of "lap belts." Mr. Cook said that Christopher was not injured and went about his normal activities the rest of the day and night. Stacy picked up Christopher on Sunday. Sergeant Jones and her partner photographed and inspected the vehicle, which had minor damage, but nothing that appeared recent. Significantly, the officers found no damage to the vehicle that might account for the child's current condition.
Homicide Detective Morales and another officer met the defendant and Stacy at the hospital. The officers brought both of them to the Investigations Bureau in Harvey. Detective Morales informed the defendant that he was under investigation for criminal child abuse and advised him of his constitutional rights. The defendant waived his rights and made a recorded statement to Detective Morales at 10:20 p.m. The defendant told the officer that the child stayed with his grandfather on Saturday. When he and Stacy picked him up on Sunday, they noticed bruises on the child's chin, forehead, and left arm. The defendant said the child had a fever and vomited on Monday and Tuesday. The *708 next morning, the defendant dropped Stacy at work, and went home. His father came over for a visit and played with Christopher, and the defendant's daughter, Rochelle, who had spent the night. Around 11:00, the defendant went to his brother's house to pick up a puppy. The defendant brought Rochelle home around noon. Around 1:30 p.m., Christopher was playing with the puppy and the defendant noticed that the child had wet his pants again. The defendant took the child inside to change him and then the child appeared to have a seizure. He ran with the child to his father's house, and performed CPR while his father called 911.
Detective Morales asked the defendant about an incident in June of 2001, in which Christopher sustained a spiral fracture to his femur while in the defendant's care. The defendant said he was having a conversation with his father while simultaneously removing the child from his car seat. The child's leg got caught in the booster seat and the defendant heard a popping noise. The defendant called Stacy and the two of them brought the child to the hospital. Thereafter, the Office of Child Protective Services placed Christopher in the custody of his grandfather, James Cook.
Because Detective Morales believed that the defendant had not been completely forthcoming, Detective Morales took the defendant to another room to talk to another officer. After approximately 15 minutes, the officer told Detective Morales that the defendant had failed to tell him something in the first statement. A few hours later, the defendant made another recorded statement. The defendant admitted he had failed to tell Detective Morales about an accident that had occurred at approximately 8:00 a.m. on November 14th at Stacy's work. The defendant said that he had removed the child from his car seat after bringing Stacy to work. While he was taking the child out of the Yukon, he shut the door on the child's head. The defendant explained that there was a construction barrel near the door of the Yukon that interfered with his ability to close the door. The child cried for few minutes, but was fine later on. The defendant said he did not tell the detective about the incident because he was afraid he would be arrested, considering he had previously been accused of breaking the child's leg. The defendant said that he had not omitted any other incidents since that morning and that he had told Detective Morales everything to a "T."
This statement lasted about 10 minutes, and Detective Morales brought the defendant and Stacy home. Later that evening, the defendant's father, Roy Galliano, came to the police station and the defendant came with him. Sergeant Thornton advised the defendant of his rights and the defendant signed a waiver of rights at 7:20 p.m. The defendant did not make any recorded statements, but Sergeant Thornton wanted to ensure that the defendant was advised of his rights before engaging in any conversation with the defendant. The defendant did not reveal any new information to Sergeant Thornton.
On November 16, 2001, Detective Morales and Sergeant Thornton met with Dr. Benton, who pinpointed the time frame of the injury to moments before the 911 call. Dr. Benton informed the officers that the child's injuries were indicative of being shaken with his head being thrown back and forth. Dr. Benton said that the injuries were not consistent with the incident in his grandfather's car on Saturday.
Later on November 16th, the officers interviewed Stacy Cook to obtain a timeline for the defendant's activities. They also executed a search warrant on the defendant's Yukon and seized several *709 items, including two car seats and a paddle. The next day, the defendant's father drove him to the police station to pick up the Yukon. Sergeant Thornton questioned the defendant. He advised the defendant of his rights, which the defendant waived by signing a form at 4:02 p.m. Approximately 45 minutes later, the defendant made a recorded statement in which he admitted that he had shaken the child. He explained that he was attempting to potty train. According to the defendant, the child infrequently had an accident. Turning to the day in question, the defendant said he and the child played with the new puppy after he brought Rochelle home. The defendant noticed the child had wet his pants for the third time that day. The defendant kneeled down, reached under the child's arms and attempted to explain the importance of asking to use the bathroom. Because the child was pre-occupied with the puppy, the defendant shook the child in order to get his attention. He acknowledged that he might have shaken the child a little harder than he was expecting. The defendant estimated that he shook the child for 30 seconds, during which the child's head was going back and forth. He demonstrated for Sergeant Thornton how he shook the child. He then took the child into the living room to change him. As the defendant removed the child's shoes and socks, the child went lifeless and seemed to have a seizure. The defendant explained that he never mentioned the shaking because he did not believe that it could have caused the child's injuries. Later that evening, the defendant was arrested.
At trial, Dr. Benton testified that the child's clinical findings of nerve damage, hemorrhages in both eyes, and subdural bleeding were indicative of "abusive head trauma . . . known as Shaken Infant Impact Syndrome." Some expert witnesses also referred to this condition as Shaken Baby Syndrome. Dr. Benton explained that these types of injuries were caused by acceleration/deceleration forces. As a consequence of the shaking, the veins that are attached to the skull tear and bleed with the acceleration/deceleration movement. In addition, the nerves inside the brain are damaged and the brain loses the ability to send signals to the rest of the body. Dr. Benton testified that Christopher had suffered significant damage to the left half of his brain.
According to Dr. Benton, none of the history provided to him, including the child's head being slammed in the car door that morning, or the automobile accident with his grandfather over the weekend, would have accounted for the child's condition.
Dr. George Ellis, an expert pediatric ophthalmologist examined the child in Children's Hospital on November 16th. The child's optic nerve was swollen and had retinal hemorrhages. He said that Shaken Baby Syndrome was the most common cause for centripetal force injuries leading to retinal hemorrhages. On December 20, 2001, when he saw the child, there were residual retinal hemorrhages and the optic nerve was still swollen. The child's vision was impaired, especially the left eye, but the child's eyes were not crossed at that time. By June of 2002, the child's left eye was crossed and he had poor vision. Dr. Ellis opined this was caused by the retinal hemorrhaging. In April of 2003, the child underwent eye muscle surgery.
The pediatric neurologist, Dr. Nadell, also agreed that the child's brain injuries were most likely caused by acceleration/deceleration of the head at high velocity. According to Dr. Nadell, the injuries would appear within minutes to hours of the trauma that caused it. Dr. Nadell said *710 the child had suffered permanent brain damage. When Christopher was finally discharged from Children's Hospital on December 20, 2001, the psychological examination revealed that he was functioning at the level of less than a one-year-old child. He was only saying single words, shaking his head "yes" or "no," and identifying his body parts with only 60% accuracy. When Dr. Nadell last saw Christopher in February of 2005, the child had weakness on the right side of his body, needed a brace for his right leg, and had language difficulties.
The defendant's expert neurologist, Dr. Trahant, testified that he had reviewed Christopher's medical records, but had not examined him in person. He said he no longer had a pediatric practice, but that he had previously diagnosed Shaken Baby Syndrome in children. Dr. Trahant testified that a malformation of the blood vessels could make a person more susceptible to a tearing injury if certain forces are applied. He stated that the medical literature on the issue indicates that 15-20 seconds of shaking is the time frame that would cause "some degree of injury." Further, Dr. Trahant agreed that the child's symptoms indicated that he was "violently shaken."
After the child's release from the hospital, James Cook was awarded custody of him. Stacy Cook[5] and James Cook described the child's condition before and after his hospitalization. Stacy said that Christopher was a normal, healthy child who was walking and talking at nine months. However, after the incident that prompted his hospitalization, his eyes crossed, necessitating one surgery and possibly a future surgery if there was no improvement. According to James Cook, Christopher's teeth decayed because of medication he took while in the hospital, which necessitated surgery on his teeth. Additionally, the child attended therapy twice a week and was in a special education class. He walked with a brace and cannot climb up a slide on a playground without assistance. Photographs of Christopher taken before November of 2001, in the hospital and after his release from the hospital were introduced into evidence.
Stacy and James Cook also described the spiral fracture, which had occurred in June of 2001. Stacy said she never had any difficulty with the car seat. The child was in a body cast from his neck to his ankles for eight weeks after his leg injury.
The defendant, who was 25 years-old at the time of trial, testified that he shook Christopher to get his attention, not to hurt him. He also said that he could not possibly have shaken Christopher for 30 seconds. He explained that he gave that time frame in his statement because that was the shortest amount of time that came to mind at the time. The defendant claimed he did not know that shaking a child would cause the kinds of injuries that Christopher sustained. According to the defendant, the child's head went back and forth and his feet never left the ground. He demonstrated for the jury how he shook the child.
In addition to Dr. Trahant, the defense called nine family members and friends to testify on his behalf. Most of these witnesses were called to testify regarding the defendant's reputation in the community for peacefulness and non-violence. His mother and father also testified as fact witnesses.

*711 DISCUSSION

Defendant now appeals, arguing fifteen assignments of error. For the reasons which follow, we affirm defendant's conviction of second degree cruelty to a juvenile and affirm defendant's sentence of 40 years imprisonment at hard labor.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant argues that his statements to members of the Jefferson Parish Sheriff's Office were involuntary because he was not free to leave; because he had a learning disability, because his mental state was impaired due to his hypoglycemia; and because he was detained for many hours without food. The State responds that the trial judge properly denied the motion to suppress.
In order for a statement or confession to be admissible at trial, the State must affirmatively show that it was made freely and voluntarily, without inducements, threats, or promises. State v. Tate, 98-117 (La.App. 5 Cir. 5/27/98), 714 So.2d 252, 255-256. If the statement was elicited during custodial interrogation, the State must also prove that defendant was advised of his constitutional rights as provided in Miranda v. Arizona.[6] See, State v. Tate, at 255.
A determination of voluntariness is made on a case-by-case basis, depending on the facts and circumstances of each situation. State v. Quest, 00-205 (La.App. 5 Cir. 10/18/00), 772 So.2d 772, 780, writ denied, 00-3137 (La.11/2/01), 800 So.2d 866. The admissibility of a confession or statement is a determination for the trial judge, whose conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. Id. In determining whether the ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the hearing on the motion to suppress but may also consider pertinent evidence given at the trial. State v. Higgins, 01-368 (La. App. 5 Cir. 10/17/01), 800 So.2d 918, 921, writ denied, 01-3267 (La.11/1/02), 828 So.2d 565, cert. denied, 538 U.S. 1038, 123 S.Ct. 2082, 155 L.Ed.2d 1070 (2003).
At the hearing on the motion to suppress, Officers Jones, Morales and Thornton testified that before the defendant made any statements, the defendant was advised of his rights, that he waived his rights by signing a form, and that his statements were freely and voluntarily given, without any coercion or threats. Another officer, Deputy Wong, also testified at the hearing. Deputy Wong was the officer who responded to the scene after 911 was called. He said that the defendant told him that he and the child were playing with a puppy when the child wet himself and then began having seizures. The defendant in his brief asserts that the prosecutor repeatedly interrupted defense counsel during his examination of Officer Wong and that the trial judge refused to control the interruptions. However, we find this argument does not pertain to defendant's assignment of error number one.
Additionally, all of the waivers of rights forms signed by the defendant advised the defendant that he was under investigation for child abuse. Although Sergeant Jones was unaware that the defendant suffered from hypoglycemia, she testified that he appeared to be in control of his faculties when she talked to him at the hospital. Likewise, Detective Morales testified that *712 the defendant did not tell him that he suffered from hypoglycemia, and that he appeared to be in control of mental faculties when he made the recorded statements on November 14th and November 15th.
At the hearing, Detective Morales testified that the defendant and Stacy rode with him and Officer Klein the hospital to Investigations Bureau at 9:30 p.m. After waiving his rights, the defendant told Detective Morales that he was a junior at Southeastern studying pre-med. After the first statement, Detective Morales asked the defendant to take a polygraph test, and defendant agreed. During the break, the defendant had a soft drink and a candy bar out of the vending machine. The polygraph was not completed, however, because the officer conducting the test said the defendant was too nervous. The defendant told Detective Morales he was nervous because he had not told the whole truth, and that is how the second recorded statement was made. According to Detective Morales, the defendant was free to leave at any time and the defendant was not arrested that night. After the defendant's second statement was complete at 12:34 a.m., the defendant was brought home.
In contrast, the defendant testified that he did not feel free to leave on November 14th. The defendant acknowledged, however, that he returned to the Investigations Bureau because the police wanted to ask some additional questions. The defendant said his father drove him there. The defendant said that he had hypoglycemia and that he must eat three times a day. According to the defendant, he feels weak and disoriented and has difficulty remembering when he does not eat. The defendant said that he had not eaten anything the day he made his first two recorded statements. At the hearing and at trial, the defendant answered affirmatively when asked whether his statements were free and voluntary.
The defendant's mother and father also testified at the hearing. According to his mother, Mrs. Galliano, the defendant becomes disoriented and suffers blackouts and convulsions if he fails to eat. While Mrs. Galliano had observed the defendant become disoriented, she had never seen the defendant blackout or have convulsions. Further, Mrs. Galliano said she was not present during his statements and did not know whether the defendant was disoriented at that time. Mr. Galliano testified that the defendant appeared disoriented when he came home from the police station on the night of the incident.
In this case, the record reflects that the defendant's statements were freely and voluntarily given after he was advised of his constitutional rights. The defendant answered affirmatively when the prosecutor asked whether he gave the statements freely and voluntarily. Further, all of the officers testified that they advised the defendant of rights, that the defendant waived rights, and that the defendant understood what he was saying.
After hearing the officers' testimony and that of the defendant and his parents, the trial judge obviously afforded more credibility to the testimony of the police officers. Based on the foregoing, we find the record supports the trial judge's determination that the defendant's statements were freely and voluntarily given. Accordingly, we find the trial court did not abuse its discretion in denying the defendant's motion to suppress his statements.
The defendant also claims in this assignment that items seized without a warrant from his home and from his vehicle should have been suppressed. We note that the defendant merely asserts his *713 claim in a few sentences with no citation to any legal authority. However, we will address this assignment of error on appeal and find the trial court did not abuse its discretion in denying defendant's motion to suppress the items seized from his home and vehicle.
Detective Morales testified that the defendant consented to having his vehicle towed by the police on the morning of November 15th, 2001. Detective Morales said he obtained a warrant before searching the vehicle, and seized two car seats and a paddle from the vehicle pursuant to the warrant. The defendant made contradictory statements at trial and at the hearing regarding his consent. At the hearing, the defendant testified he did not consent to the officers' taking his vehicle, while at trial, the defendant said he agreed to let Detective Morales tow the Yukon. At trial, the defendant further testified the officer said he would get a search warrant before searching the Yukon.
We find defendant's assignment of error number one is without merit and the trial court did not abuse its discretion in denying defendant's motion to suppress.

ASSIGNMENT OF ERROR NUMBER TWO
The defendant contends that the trial judge should have excluded evidence of the child's femur fracture. The defendant acknowledges that the Louisiana Supreme Court ruled in a pre-trial writ disposition that this evidence was admissible, but nevertheless contends that it should have been excluded because the prosecutor failed to mention the femur fracture in opening statement. He also claims the bill of information does not list a time frame that would have included this injury.
The State responds that, although the prosecutor did not mention the leg injury in opening statement, the trial judge did not err by admitting evidence of the injury and that the defendant suffered no prejudice.
LSA-C.Cr.P. art. 766 provides that "[t]he opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge." The purpose of an opening statement is to acquaint the jury with the case in order to prevent confusion, and to protect the defendant from being taken by surprise or prejudiced in the preparation of his defense. State v. Koontz, 98-367 (La.App. 5 Cir. 11/25/98), 722 So.2d 1081, 1085, writ denied, 99-0161 (La.5/28/99), 743 So.2d 659. The State need only set forth the theory of its case in general terms in the opening statement. Id. It is not necessary that the State detail every shred of evidence; rather, it is sufficient that the State give a general description of the evidence it plans to introduce. Koontz, at 1086.
In this case, the transcript of the prosecutor's opening statement shows that, while she mentioned that the defendant had slammed the child's head in the door earlier in the day, she did not mention that she planned to introduce evidence of the leg injury. When the prosecutor questioned Detective Morales about the defendant's statements, the defendant objected on the grounds that the State was about to introduce evidence of the leg injury, which was not alluded to in the opening statement. The trial judge stated that it was her recollection that the prosecutor had mentioned the injury. However, the trial judge overruled the defendant's objection, finding that, even if the prosecutor had not mentioned the injury, the prosecutor had generally explained the State's case, and that she had mentioned a history of misconduct by the defendant toward the child. *714 When Detective Morales described what the defendant said about the child's injury, the defendant re-urged his objection, which was overruled.
LSA-C.Cr.P. art. 769 relates to the admission of evidence and the State's opening statement:
Evidence not fairly within the scope of the opening statement of the state shall not be admitted in evidence.
If the state offers evidence that was inadvertently and in good faith omitted from the opening statement, the court, in its discretion may admit the evidence if it finds that the defendant is not taken by surprise or prejudiced in the preparation of his defense.
In State v. Koontz, supra, the defendant complained that the trial court improperly admitted the testimony of testimony of the doctor, Dr. Scott Benton, who examined the child abuse victim because the prosecutor failed to mention, in opening statement, that he intended to introduce Dr. Benton's testimony. Even though there was no reference to the anticipated testimony in opening statement, the Koontz court pointed out that the defendant never stated at trial, or on appeal, how he was surprised or otherwise prejudiced by Dr. Benton's testimony, and that the doctor's findings corroborated the victim's testimony. Further, the trial court ruled that the doctor could only refer to materials previously provided to the defendant. Koontz, 722 So.2d at 1086.
In the present case, we find, as in Koontz, that the trial judge did not err in admitting the evidence of the spiral fracture, even though it was not mentioned in opening statement. The defendant knew that State intended to introduce evidence of the leg injury, considering that it was the subject of a pre-trial proceedings. There was a lengthy pre-trial hearing, a writ application to this Court, and a writ application to the Louisiana Supreme Court, ruled that the evidence was admissible. State v. Galliano, supra, 839 So.2d at 933-934. Therefore, we find defendant's assignment of error number two is without merit and the trial court did not err in failing to exclude the evidence of the child's prior femur fracture.

ASSIGNMENT OF ERROR NUMBER THREE
The defendant contends that the trial judge improperly admitted evidence that the defendant shut the child's head in the door because the State failed to notify the defendant it intended to introduce this evidence. The State acknowledges that it did not give the defendant any formal notice, but contends that the incident was "res gestae" or integral act evidence, which is admissible without notice. The State further responds that the defendant should have known the evidence relating to the head injury would be admitted, since it was contained within his own statement to Detective Morales, which was ruled admissible well in advance of trial.
On March 13, 2002, the defendant filed motions requesting notice of any evidence the State intended to introduce under LSA-C.Cr.P. art. 404(B). The State's response included the leg injury that occurred several months before the shaking incident. It did not include the head injury, which was sustained on the day of the incident.
On November 23, 2004, a week before trial, the defendant filed a "MOTION IN LIMINE" to exclude evidence of an injury to the child's head, which was contained in the police reports and transcripts of the defendant's statements. The defendant moved to exclude any references to the injury because the State had failed to notice the head injury as other crimes evidence. *715 The record does not reflect that the motion was set for hearing, but on the day of trial, the defendant brought up the outstanding motion. The State responded that it did intend to introduce evidence of the head injury. The State further responded that it had not noticed the incident because the defendant had actual knowledge of the incident, since it was contained in the defendant statement and was part of Dr. Benton's medical records, which were given to the defendant before trial. The defendant reiterated his objection, stating that the events were unrelated. The trial judge ruled as follows:
The State has a right prior to opening statement to give you notice of prior bad acts. You had actual notice by way of the statements provided to the police. It is very arguable that this is part and parcel of the same series of events in the same day which the case law still call res gestae, and therefore, I'm going to find that it is admissible . . .
Evidence of other crimes, wrongs or acts may be introduced when it is independently relevant or when it relates to conduct, formerly referred to as res gestae, that "constitutes an integral part of the act or transaction that is the subject of the present proceeding." LSA-C.E. art. 404(B)(1). A close connexity between the charged and uncharged conduct is required to insure that "`the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" State v. Noten, 01-1818 (La.6/25/01), 791 So.2d 607, 609 (per curiam), internal citations omitted.
The test for integral act (res gestae) evidence is therefore not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive the State's case of narrative momentum and cohesiveness, "`with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.' " State v. Colomb, 98-2813 (La.10/1/99), 747 So.2d 1074, 1076, quoting Old Chief v. United States, 519 U.S. 172, 186, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997). Accord, State v. Taylor, 01-1638 (La.1/14/03), 838 So.2d 729, 741-742, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004).
We find that the trial court did not err in finding the head injury incident was res gestae, considering the close temporal connection of the charged offense and the head injury. The incident occurred around 8:00 in the morning, when the defendant brought Stacy to work. The shaking incident occurred at approximately 1:30 p.m. on the same day. Therefore, we find defendant's assignment of error number three is without merit and the trial court did not err.

ASSIGNMENT OF ERROR NUMBER FOUR
The defendant contends that the trial judge erred by allowing the State to introduce color photographs that were not previously provided in discovery. The State responds that the trial judge's ruling was not an abuse of discretion because the defendant was not prejudiced.
The defendant does not specify the color photographs that he claims were inadmissible. The record reflects that the trial judge admitted one 8 × 10 color photograph of the child taken in the hospital by the crime scene technician during Detective Morales' testimony. This photo was admitted over the defendant's objection, which was on the basis that the State only *716 provided small (2-inch) black and white copies of photographs of the child in the hospital, not large, color photographs of the child in the hospital. The State responded that the defendant had the opportunity to view the original photographs, but that he never asked to do so. The defendant acknowledged he was given open file discovery, but asserted that the color photographs were not in the district attorney's file. Thereafter, the trial judge ruled that the photo was admissible because the State had provided adequate discovery with the black and white photos and because of Detective Morales' testimony that the photo accurately depicted the child in the hospital.
Later, during a break, defense counsel reviewed his file and compared some color photos the State intended to introduce with the photos previously provided in discovery. Defense counsel admitted that, after reviewing his file, the State had in fact provided some color photos in discovery. However, he said that neither these photos, nor the black and white photos corresponded to the photos that the State was attempting to introduce. The State responded that the defense had adequate notice of the all photos, even if not provided, since they were described in the police report, which he received. Thereafter, the trial judge ruled that only the color photos that corresponded to the black and white photos were admissible. The trial judge directed the State to proffer the color photos that did not correspond to the black and white photos.[7]
It became clear during Dr. Benton's testimony that the black and white photos provided to the defendant before trial were actually taken by Dr. Benton while the child was in the hospital. Outside the jury's presence, the State informed the court that the photos were actually on a CD, which Dr. Benton planned to show the jury with a projector. The defendant objected, and the court reiterated that the photos were admissible because the State had adequately complied with its discovery obligation by producing the black and white photos. The black and white photos that Dr. Benton took in the hospital were admitted as S-29. The photos on the CD were shown to the jury with a projector, but were not introduced into evidence during Dr. Benton's testimony.[8]
The defendant now argues on appeal that the trial judge improperly allowed the jury to view the slides during Dr. Benton's testimony. Although the defendant contends that a "series" of photos were introduced at trial, the record reflects that only one crime scene photo was introduced. The other crime scene photos were proffered.
According to LSA-C.Cr.P. art. 718(2), on motion of the defendant, the court shall order the district attorney to permit the defendant to inspect, copy, examine, photograph, or otherwise reproduce photographs that are within the possession, *717 custody, or control of the State and are intended for use by the State as evidence at the trial. Discovery rules are intended to eliminate unwarranted prejudice arising from surprise testimony to permit the defense to meet the State's case, and to allow proper assessment of the strength of its evidence in preparing a defense. State v. Harris, 00-3459 (La.2/26/02), 812 So.2d 612, 617. In the event of a discovery violation, the court may order the party to permit the discovery, may grant a continuance, may order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate. LSA-C.Cr.P. art. 729.5(A). A conviction will not be reversed on the basis of the State's discovery violation unless prejudice is shown. State v. Harris, supra.
In State v. McGee, 04-963 (La.App. 5 Cir. 1/11/05), 894 So.2d 398, 411, writ denied, 05-0593 (La.5/20/05), 902 So.2d 1050, this Court held that the State's failure to turn over photographs of the victim's injuries to the defendant prior to trial was not reversible error. In that case, the State included in its discovery materials, the police report reflecting that the crime scene technician took photographs at the scene. As such, the defendant was sufficiently put on notice of photographs taken in association with that investigation. Id. at 411. In State v. Lee, 510 So.2d 1378, 1381 (La. App. 3 Cir.1987), the court held that the State adequately complied with its discovery obligation by providing the defendant with black and white copies of photographs, even though color photographs were introduced at trial.
As in McGee, the State's discovery materials to the defendant in the present case contained a police report reflecting that a crime scene technician took photographs of the child. Further, the black and white photos produced by the State contain a statement that the photographs were taken by Dr. Benton. Thus, the defendant knew in advance of trial that photos were taken of the child in the hospital by Dr. Benton and a crime scene technician. While the defendant complains about the photos' admission, he failed to assert how the disclosure of any of the color photos would have aided in preparing for trial or how his defense would have been any different. Based on the foregoing, it appears that the trial judge did not err in admitting the color photo taken by the crime scene technician.
The defendant also asserts in the caption to this assigned error that the trial judge erred by refusing to remove the jury from the courtroom during argument and when ruling on the defendant's objection. Because he does not mention this position in the discussion of the assignment, we find that he has abandoned it. See, State v. McGinnis, 04-1286 (La.App. 5 Cir. 10/6/05), 917 So.2d 471, 486, writ denied, 05-2469 (La.4/28/06), 927 So.2d 283, where this Court declined to address issues that the defendant did not brief. Accord, State v. Jacobs, 04-1219 (La.App. 5 Cir. 5/31/05), 904 So.2d 82.

ASSIGNMENT OF ERROR NUMBER FIVE
The defendant, with no citation to any legal authority, claims that State's reference to a paddle, held inadmissible by the trial judge, warranted an instruction to the jury and a mistrial. The defendant claims that he suffered prejudice because the jury saw the paddle. He contends that the court was compelled to caution the jury to disregard the physical evidence, even though it was not admitted into evidence. The State responds that this claim should be deemed abandoned because the *718 defendant failed to brief it. The State asserts that it is in the position of having to guess at the basis for the defendant's position, considering that he does not identify what prejudice he suffered. The State contends that, if the Court does not find that the assignment is abandoned, the defendant suffered no prejudice from the jury's momentary viewing of evidence that was excluded by the trial court.
The State showed Detective Morales the items seized from the defendant's Yukon pursuant to the search warrant. Detective Morales identified them as a paddle and two car seats. When the State moved to introduce the items into evidence, the defendant objected to the paddle as irrelevant because it had not been linked to the defendant. After the trial judge sustained the defendant's objection, he moved the trial judge to instruct the jury, which the court denied, and moved for a mistrial.
This Court has previously held that a defendant's conviction should not be reversed for errors unless his substantial rights have been violated. See, State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, 71, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481. A mistrial is a drastic remedy and, except in instances where a mistrial is mandatory, it is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. State v. Ballay, 99-906 (La.App. 5 Cir. 2/29/00), 757 So.2d 115, 126, writ denied, 00-0908 (La.4/20/01), 790 So.2d 13. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a mistrial motion will not be disturbed on appeal absent an abuse of that discretion. Id.
The paddle was excluded as irrelevant. Before deliberations, the trial judge instructed the jurors that they could only consider evidence that was admitted. As such, we find that the trial judge's refusal to give an instruction to the jury during trial or to declare a mistrial did not violate the defendant's substantial rights.

ASSIGNMENT OF ERROR NUMBER SIX
The defendant contends that the trial judge erred in allowing Sergeant Thornton to demonstrate how the defendant shook the child. The defendant complains that Sergeant Thornton's demonstration was the officer's own interpretation of what the defendant said, as opposed to an accurate representation of how the defendant demonstrated shaking the child during his statement. The defendant contends that the demonstration misled the jury and constituted reversible error.
The State responds that this assignment should be abandoned because it lacks citation to any legal authority. Alternatively, the State responds that the jury was not misled because Sergeant Thornton clarified on cross-examination that he was demonstrating the way in which the defendant told him he shook the child.
The defendant's statement to Sergeant Thornton reveals that the defendant shook a book to demonstrate the manner in which he shook the child. When the prosecutor asked Sergeant Thornton to use a legal pad to imitate the demonstration, the defendant objected that the statement did not reflect the length of the defendant's demonstration or how the demonstration took place. The trial judge overruled the objection, noting that the demonstration occurred during the taped statement. Thereafter, it appears from the record that Sergeant Thornton kneeled down and shook the legal pad while the prosecutor counted up to 30 seconds in 10 second intervals.
*719 On cross-examination, Sergeant Thornton acknowledged that the defendant did not kneel down while demonstrating how he shook the child and that he did not time the defendant during the demonstration. Sergeant Thornton stated that his demonstration in court with the legal pad was an accurate depiction of what the defendant said in his statement because the defendant said he was on his knees while shaking the child for 30 seconds.
A trial court has great discretion in permitting or refusing in-court experiments and demonstrations. State v. Maize, 94-0736 (La.App. 1 Cir. 5/5/95), 655 So.2d 500, 514, writ denied, 95-1894 (La.12/15/95), 664 So.2d 451, citing State v. Hampton, 326 So.2d 364, 366 (La.1976); State v. Mays, 315 So.2d 766, 768 (1975). Usually, however, simple demonstrations by a witness are permissible. Id. The criteria for withholding permission include considerations arising from the possible disruption of orderly and expeditious proceedings or from a lack of similarity between conditions in the courtroom and the actual conditions sought to be retested. Id.
In this case, we find the trial court did not err in allowing the demonstration. The jury heard the taped statement and could compare what the defendant said in the statement to Sergeant Thornton's demonstration. Further, during his testimony, the defendant demonstrated for the jury exactly how he shook the child. A defendant's conviction should not be reversed for errors unless the accused's substantial rights have been violated. State v. Winfrey, 703 So.2d at 71. We find that the defendant's substantial rights were not violated by Sergeant Thornton's demonstration.

ASSIGNMENT OF ERROR NUMBERS SEVEN AND EIGHT
In these assignments, the defendant contends that the trial court erred in allowing Dr. Benton to testify about the child's spiral femur fracture and the brain injury because he was not qualified as an expert in ergonomics or in neurology. The State responds that the assignment regarding the brain injury was not preserved for appeal because the defendant's objection was untimely and that the testimony was in any event, within the doctor's expertise.
At trial, Dr. Benton testified that, after obtaining his medical degree, he completed a pediatric residency and a clerkship in pediatric forensic medicine. He worked for the Jefferson Parish Coroner's Office and LSU to learn about child abuse and neglect. He was a professor of pediatrics at LSU and Tulane. Dr. Benton testified that his primary focus was learning to better apply pediatrics to evaluate child abuse and neglect. Thereafter, the defendant stipulated to Dr. Benton's expertise.
The prosecutor asked Dr. Benton whether a spiral femur fracture could occur when a child was removed from the car seat that was seized from the defendant's vehicle. The defendant objected on the basis that Dr. Benton was not qualified to answer the question. The trial judge ruled that, although Dr. Benton was not an orthopedist, he was qualified because of the nature of his practice to explain "to some degree the expected physical mechanism which would produce such things as a spiral trauma."
Thereafter, Dr. Benton testified that he did not believe that it was feasible for a spiral femur fracture to be accidentally sustained when removing a child from the seat. According to Dr. Benton, the only way Christopher's leg injury could be explained *720 by being removed from the car seat was that it was done with great force and far beyond "reasonably preventable injury." Dr. Benton explained the manner in which a spiral fracture is caused:
The cause of all spiral femur fractures is a torsion on the bone. The bone has to be twisted, and done fairly rapidly. In children the ligaments are very strong, and strongly attach to the bone. If you do something slow what is going to give is the ligaments. It has to be done fast and hard like a snap. The bone sustains the major part of the force if it is done with torsion.
Thereafter, Dr. Benton testified at length regarding the child's brain injury and had expressed his opinion regarding the cause of the brain injuries. The defendant ultimately objected that Dr. Benton was not qualified to testify about the child's brain injuries, but the trial judge overruled the objection.
We find that assignment eight, regarding the brain injury, was not preserved for appeal. LSA-C.Cr.P. art. 841 provides that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." Because Dr. Benton discussed the child's brain injury at length before the defendant objected on the basis that he was not qualified to express his opinion, it appears that the defendant's objection was untimely. See, State v. Sepulvado, 359 So.2d 137, 139-140 (1978), (defendant was precluded from challenging testimony on appeal because he objected too late).
As to defendant's assignment number seven, we find the record discloses no abuse of the trial court's discretion in allowing the testimony of Dr. Benton on the child's femur fracture. LSA-C.Cr.P. art. 702 provides as follows regarding testimony by experts:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The trial court has wide discretion in determining the competence of an expert witness and its ruling on the qualification of the witness will not be disturbed absent an abuse of discretion. State v. Torregano, 03-1335 (La.App. 5 Cir. 5/11/04), 875 So.2d 842, 847.
Upon review of the trial court's decision, the appellate courts will also consider whether a witness has previously been qualified as an expert. Id. A review of Louisiana published decisions reveals numerous cases in which Dr. Benton has testified as an expert in child physical and sexual abuse. He has previously testified in several cases that have been before this Court on appeal involving both physical abuse and in cases where a child has sustained brain injuries due to Shaken Baby Syndrome. See, State v. Glenn, 04-526 (La.App. 5 Cir. 3/1/05), 900 So.2d 26; State v. Smith, 04-199 (La.App. 5 Cir. 6/29/04), 877 So.2d 1123, 1128, writ denied, 04-2081 (La.1/7/05), 891 So.2d 669.
The record in this case reflects that Dr. Benton had examined the child for a follow-up visit two weeks after the leg injury in June of 2001 and Dr. Benton was one of the child's attending physicians when he was admitted to Children's Hospital on November 14, 2001. A physician testifying as an expert may properly give an opinion as to the probable manner in which a wound or other traumatic injury was inflicted, where such testimony is based on facts within the knowledge of the witness. See, State v. White, 298 So.2d 733, 734 (La.1974); State v. Byles, 94-776 *721 (La.App. 5 Cir. 2/15/95), 652 So.2d 59, 62. Dr. Benton stated the facts upon which his opinion was based regarding the manner of the leg injury. Thus, as an expert medical witness, Dr. Benton could express an opinion regarding the cause of the injury. See, State v. White, supra.[9]
Therefore, we find the trial court did not abuse its discretion in allowing testimony of Dr. Benton regarding the child's femur fracture.

ASSIGNMENT OF ERROR NUMBER NINE
The defendant claims that the trial judge improperly allowed the State to ask the defendant about stalking and harassment allegations made by his former girlfriend, Misty Luminais, in their domestic court proceedings. The defendant claims the questioning was irrelevant because the allegations did not show violence toward children. The defendant further claims that his right to cross-examine Ms. Luminais was abridged because the State was allowed to question him about these allegations without presenting Ms. Luminais as a witness, and that the trial judge should have granted his mistrial motion on that basis. The State responds that the trial judge properly allowed the State to question the defendant in this regard because the testimony was in response to the defendant's character evidence.
The record in this case reflects that nine witnesses, including friends and family members, testified about the defendant's virtues and further testified that the defendant was known for peacefulness and non-violence in the community. This testimony was not limited to the defendant's reputation of peacefulness and non-violence toward children.
On cross-examination, the prosecutor asked the defendant about his relationship with Ms. Luminais in January of 2000. The defendant answered that he did not recall the tenor of the relationship at that point in time, but that he did not remember any particular problem. At the bench, the prosecutor told the judge that the State had learned that Ms. Luminais had filed a reconventional demand in the year 2000 seeking custody of the child in which Ms. Luminais alleged the defendant had committed certain acts of harassment, threats, stalking, showing up at her residence unannounced, and threatening to remove the child from the state. The prosecutor told the court that the domestic proceedings contained a consent judgment indicating that the parties had reciprocal restraining orders against each other. The defendant complained that he could not cross-examine the pleading and that he had a right to cross-examine Ms. Luminais, not a piece of paper.[10]
The trial judge found that the court documents furnished an adequate basis for the State's questions to the defendant without calling Ms. Luminais as a witness because the defendant put his character for peacefulness at issue. The defendant moved for a mistrial on this basis.
Thereafter, the State questioned the defendant about the restraining order. When the prosecutor asked if the defendant remembered being served with a restraining order, the defendant answered *722 negatively. The State showed the defendant a document identified as a reconventional demand filed in case number 546-119, Galliano versus Luminais. The prosecutor asked the defendant if Ms. Luminais had filed a document in court alleging that the defendant harassed her, stalked her by driving by her residence and her job, threatened not to return the child from visitation unless Ms. Luminais was there to speak with the defendant, and threatened and pursued Ms. Luminais and her friends in a vehicle. The defendant answered that he did not recall Ms. Luminais making any of these allegations, but acknowledged that they had both signed a consent judgment on January 11, 2000, agreeing to mutual restraining orders. The consent judgment was admitted into evidence, however, the other pleadings were not.
The State is allowed to introduce evidence of the defendant's bad character only for the purpose of rebutting evidence of good character presented on the defendant's behalf. State v. Bagley, 378 So.2d 1356, 1357-1358 (La.1979). Further, LSA-C.E. art. 607(C) permits a party to attack the credibility of a witness by examining him "concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony." This grant is subject to the relevancy constraints set forth in LSA-C.E. art. 403,[11] and is limited in scope by LSA-C.E. art. 608(B).[12]State v. Ellis, 94-599 (La. App. 5 Cir. 5/30/95), 657 So.2d 341, 353, writs denied, 95-2095 (La.12/8/95), 664 So.2d 421 and 95-1639 (La. 1/5/96), 666 So.2d 300. A trial judge's determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. State v. Sandoval, 02-230 (La.App. 5 Cir. 2/25/03), 841 So.2d 977, 985, writ denied, 03-853 (La.10/3/03), 855 So.2d 308.
In State v. Toca, 551 So.2d 4, 4-5 (La. App. 4 Cir.1989), the defendant argued the trial court erroneously permitted evidence of the defendant's bad character while he was testifying on cross examination when the State questioned the defendant about a prior shooting. However, the court held that the questioning was proper rebuttal because the defendant had placed his character at issue by testifying on direct examination, "No, sir, I do not do anything like that. I do not rob or kill anyone, as God is my witness."
In the present case, the defendant placed his character at issue by presenting numerous witnesses who gave extensive testimony that the defendant was highly regarded in the community and had a reputation for peacefulness and non-violence toward children and adults. The State's line of questioning about Ms. Luminais' allegations contained in the court documents concerning the defendant's harassment was relevant to rebut the defendant's character evidence of peacefulness. As such, we find that the trial judge did not err in allowing the State to cross-examine the defendant in this regard without calling Ms. Luminais as a witness or in denying the motion for a mistrial made on that basis.

*723 ASSIGNMENT OF ERROR NUMBER TEN

The defendant contends that the trial court erred in refusing to give his requested special jury instructions regarding criminal negligence because they were correct statements of the law and did not require clarification. The State responds that the trial court properly denied the special charges because the subject matter was addressed in the general charge given by the court.
The defendant also contends that the trial judge erred in failing to modify the jury charges as suggested in the charge conference. The State responds that this claim should be abandoned because the defendant failed to brief it. The record reflects that the trial judge discussed the jury charges that she proposed to give the jury. The defendant suggested several changes to the wording of the charges and objected when the judge denied his request. On appeal, the defendant refers generally to the fact that the trial judge erred in denying his suggestions, but he does not specify the modifications he sought, any citation to legal authority for the modifications, or any prejudice he suffered from the failure of the trial judge to make the modifications. Accordingly, it appears defendant's claim regarding changes to the general jury instructions should be considered abandoned. See, State v. McGinnis, supra.
Regarding the special jury charges, LSA-C.Cr.P. art. 807 provides as follows:
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
In this case, the defendant requested the following special jury charges, which the trial judge denied:
Defendant's Proposed Jury Instruction No. 1
I instruct you that unless you find beyond a reasonable doubt that Joe Galliano's conduct was in reckless disregard of another, that is, unless you find that he intentionally performed an act knowing or having reason to know of facts which would lead a reasonable man to realize that his conduct not only created an unreasonable risk of bodily harm to the other person, but also invoked a high degree of probability that substantial harm would result to the other person, you must find Joe Galliano NOT GUILTY.

State v. Moak, 387 So.2d 1108 (La.1980).
Defendant's Proposed Jury Instruction No. 2
I instruct you that proof of ordinary negligence does not constitute proof of criminal negligence and that the State must prove, beyond a reasonable doubt, more than a mere deviation from the standard of ordinary care. Criminal negligence does not exist unless the actions of the accused demonstrate a gross disregard for the consequences of those actions. Moreover, "gross disregard" does not exist unless the actor KNOWS or has reason to know facts which create a high risk of physical harm to another, yet DELIBERATELY proceeds *724 to act in total disregard of that risk. If the State has failed in that burden, you must find Joe Galliano NOT GUILTY. State v. Moak, 387 So.2d 1108 (La.1980). State v. Jones;[,] 298 So.2d 774 (La. 1974). State v. Fenner, 664 So.2d 1315 (La.App. 4 Cir.1995) (Judge Waltzer's Concurrence).
The trial judge stated as follows regarding criminal negligence when charging the jury:
Criminal negligence exists when although neither specific nor general criminal intent is present, there is such disregard for the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under the circumstances.
The term intentional within the meaning of the statute requires general criminal incident to cause a child unjustifiable pain and suffering. Mistreatment means abuse. To be criminally negligent in his mistreatment or negligence of the child, the defendant must have such disregard for the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. Proof of ordinary negligence does not constitute proof of criminal negligence. The State is required to show more than a mere deviation from the standard of ordinary care.
Ordinary negligence consists of mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the act or adequately to cope with a possible or probable future emergency.
Ordinary negligence does not constitute proof of criminal negligence, and the state must prove beyond a reasonable doubt more than a mere deviation from the standard of ordinary care.
Criminal negligence does not exist unless the actions of the accused demonstrate such disregard for the interest of the victim that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under the circumstances.
In this case, we find that the trial judge did not err in refusing the requested special charges because the general charges include the definition of criminal negligence as provided by LSA-R.S. 14:12.[13] Further, the court's instructions contain the definition of criminal negligence as stated by this Court in State v. Richthofen, 01-500 (La.App. 5 Cir. 11/27/01), 803 So.2d 171, 184, writ denied, 02-0206 (La.1/31/03), 836 So.2d 57, a case in which the defendant was convicted of second degree murder while engaged in the perpetration of cruelty to a juvenile where the child suffered Shaken Baby Syndrome.
In addition, the failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. See, State v. Uloho, 04-55 (La.App. 5 Cir. 5/26/04), 875 So.2d 918, 927, writ denied, 04-1640 (La.11/19/04), 888 So.2d 192.
Considering the foregoing, we find that the trial judge properly denied the requested instructions because the general *725 charges were adequate. Further, the record reveals no miscarriage of justice, prejudice or violation of defendant's rights involved in this assignment of error.

ASSIGNMENT OF ERROR NUMBER ELEVEN
The defendant alleges that the trial court erred by denying his motion for a mistrial because the trial court's clerk circulated "a number of documents not admitted into evidence. Some of these included statements not intended by the Court to reach the Jury." The State responds that this assignment should be considered abandoned for failure to properly brief the assignment, considering that the defendant fails to cite to any legal authority in this assignment and fails to state how the jury's viewing these documents caused any particular prejudice to the defendant. The State responds that, in any event, the trial judge properly denied the motion for a mistrial because the documents that the jury saw, that is, the transcribed statements of Stacy Cook and the defendant's father, were merely cumulative of their trial testimony.
The record reflects that the transcribed statements of Stacy Cook and the defendant's father were not introduced into evidence. During Detective Thornton's testimony, he identified the rights form signed by Stacy on November 16th and her transcribed statement to him. The court ruled that the waiver of rights form was admissible, but that the statement was inadmissible. When Stacy testified, the prosecutor asked her whether she had given a statement to the police. She replied that she had spoken to several police officers. She identified the waiver of rights form that she signed every time that she spoke to the police. On cross-examination, the defendant asked Stacy whether she had told the police that the defendant and Christopher had a good relationship, and she replied affirmatively. The defendant also asked Stacy if she told the police in her first statement on November 14th, that Christopher was not talking very much.
On redirect examination, the defendant questioned Stacy about her statement on November 14th to Detective Jody Cummings. Notably, the defendant never referred to the November 16th statement. The statement was identified as Defense Exhibit 5(D-5).
The defendant's father testified on behalf of the defense. The prosecutor used the defendant's father's statement, identified as S-34, on cross-examination to discuss inconsistencies between the statement and his testimony. The defense redirected on various aspects of the statement.
After the State and the defendant rested, the evidence was shown to the jury. Based on the trial court's summary in the record, the jury asked to view the defendant's statements, but the trial court's clerk mistakenly provided the statements of Stacy Cook and the defendant's father. The defendant moved for a mistrial. The trial judge assumed that the jury had read both statements, but denied the mistrial on the basis that the statements were cumulative of the witnesses' testimony and that any error was harmless. Further, the judge instructed the jury to disregard the statements because they were not admitted as substantive evidence, but were used to refresh a recollection or for impeachment purposes. The judge instructed the jury that the substance of the statements were of no consequence because the jury heard the witnesses' live testimony. The trial judge then placed the statements into separate envelopes, which are included with this appeal.
The circumstance presented in this assignment can be analogized to the *726 situation where inadmissible evidence is introduced at trial. Although a statement may constitute inadmissible hearsay, if the statement is merely cumulative or corroborative of other evidence, the admission of the evidence is harmless error.[14]State v. Addison, 00-1730 (La.App. 5 Cir.5/16/01), 788 So.2d 608, 616, writ denied, 01-1660 (La.4/26/02), 814 So.2d 549. The inquiry is whether the guilty verdict actually rendered in the trial was surely unattributable to the error. See, Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); State v. Maise, 00-1158 (La.1/15/02), 805 So.2d 1141, 1148.
We find that the error of the jury's viewing the statements was harmless. The trial judge gave a curative instruction immediately after the occurrence, neither statement involved any evidence of another crime committed by the defendant that was not referred to at trial, the statements contained no inculpatory information not referred to at trial, and the statements were essentially cumulative of the witnesses' testimony.

ASSIGNMENT OF ERROR NUMBER TWELVE
The defendant claims that the trial judge committed reversible error by refusing to grant his motion for new trial. The State responds that the assignment should be considered abandoned because the defendant provides no argument or citation to legal authority. The State alternatively responds that the trial judge did not err in denying the motion for new trial.
LSA-C.C.P. art. 851 provides:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
The defendant filed a motion for new trial on grounds (1), (2), and (5), ends of justice. He filed a supplemental motion for new trial on ground (3), newly discovered evidence and included an allegation the trial judge should have been recused.
Upon the trial judge's request at the hearing on the motion for new trial, the defendant gave a summary of the witnesses' expected testimony. The defendant *727 then asserted that he did not intend to abandon any of the other grounds contained in the motion for new trial, and that the summary was relevant to his ends of justice claim. Thereafter, the trial judge ruled that, even assuming the witnesses testified in accordance with the defendant's summary, the defendant had an opportunity to present the testimony at trial, but failed to do so.
The following is the entirety of the defendant's argument from his brief:
During the hearing before the Trial Judge on appellant's Motion for a New Trial voluminous evidence was presented (by way of an accepted "proffer") of the following:
1) The victim, Christopher Cook, had been in the care of appellant's father for a period just prior to the commencement of seizures, which facts were not known to defense counsel and not remembered by appellant and which involved false testimony given by appellant's father during the trial; and
2) Appellant's father, Roby Galliano, Sr., who avoided subpoenas for his testimony at the Motion for New Trial hearing, had a history of intimidation and repression of his children.
The evidence adduced at the hearing on appellant's Motion for New Trial was compelling and required that, in the interest of justice, the Court order a new trial.
The defendant's citation to the record spans 27 pages, his argument contains no citation to legal authority, and he fails to specify the basis for the trial court's error. This assignment is not adequately briefed. Accordingly, we find this assignment is deemed abandoned.

ASSIGNMENT OF ERROR NUMBER THIRTEEN
The defendant claims that Judge Wicker, and subsequently Judge Cusimano, erred in denying the defendant's motion to recuse because she was predisposed to impose the maximum sentence, despite having any sentencing information. The State responds that it was not error to deny the motion to recuse because the record contains no evidence of any bias or prejudice on the part of the trial judge.
LSA-C.Cr.P. art. 674 provides that a party desiring to recuse a trial judge shall file a written motion assigning the ground(s) for recusation. Article 674 further provides that if a valid ground for recusation is set forth in the motion, the judge shall either recuse himself or refer the motion for hearing to another judge. However, if the trial judge finds that the motion does not set forth affirmative allegations of fact stating valid grounds for recusation, the trial judge may overrule the motion without referring the matter to another judge. State v. Williams, 601 So.2d 1374 (La.1992).
LSA-C.Cr.P. art. 671 outlines the grounds for recusing a judge:
LSA-C.Cr.P. art. 671(A) provides in part:
(A) In a criminal case a judge of any court, trial or appellate, shall be recused when he:
(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
. . .
(6) Would be unable, for any reason, to conduct a fair and impartial trial.
These grounds are exclusive, not illustrative. In re Lemoine, 96-2116 (La.1/14/97), 686 So.2d 837, 843, on reh'g, 96-2116 (La.4/4/97), 692 So.2d 358. A trial judge is presumed to be impartial. In order to obtain a recusal based on bias, *728 prejudice, and personal interest, the party seeking the recusal must establish more than conclusory allegations. State v. Davis, 00-1753 (La.App. 5 Cir. 4/24/01), 786 So.2d 834, 843, writ denied, 01-1467 (La.4/26/02), 816 So.2d 846.
On January 7, 2005, the defendant filed a motion to recuse Judge Wicker on the basis that she was biased. The defendant asserted that his motion for new trial and the supplement to that motion were also based on allegations of bias. Therefore, he sought to recuse Judge Wicker so that a new judge could be appointed to hear the defendant's motion for new trial. The supplement to the motion for new trial alleges that Judge Wicker informed the defense in the presence of the prosecutor on December 8, 2004 that she planned to impose the maximum 40-year sentence, despite the fact that the defendant had no prior convictions, because she had a mentally retarded child.
However, at a hearing on the motion before Judge Wicker, the defendant orally amended the motion to delete that allegation. The defendant stated he had previously misunderstood the trial judge to say that she had a developmentally delayed child. The trial judge stated she was unaware of the misunderstanding until reading the defendant's motion. Nevertheless, the defendant maintained that Judge Wicker was biased because she had predetermined she would impose the maximum sentence. The State responded that this was not a ground for recusal.
The trial judge denied the motion to recuse with extensive reasons. In particular, the trial judge stated that she had heard the evidence after a week long trial and that "it is time to take all of the evidence into consideration in determining what the sentence would be." The trial judge related that the child's injuries were so serious that homicide conducted the investigation because the child was expected to die. The trial judge pointed out that the child had no use of one side of his body, was still cross-eyed despite surgery, would require speech and occupational therapy, and that the child was basically retarded. Judge Wicker stated that she compared her notes from the trial to the sentencing guidelines and told the defense attorney that she would not gain any new information from a pre-sentence investigation report. The trial judge also stated that she found very little difference between attempted murder and the case before her. The trial judge concluded:
I am very comfortable with the notion of a sentence of 40 years at hard labor, which is the maximum sentence. That is a thought out, deliberated thought process. There is no bias to it. This is looking at the evidence and comparing it to the law. Therefore I deny the motion to recuse.
Thereafter, the matter was allotted to another division and a hearing was held before Judge Cusimano. At the hearing, the trial judge again explained that she thought a 40-year sentence was appropriate, but that she would listen to everything presented to her before making the final determination on sentencing. At the conclusion of the hearing, Judge Cusimano denied the motion to recuse.
We find that Judge Wicker's comments were based on the evidence and were merely an expression of the sentence she intended to impose. There is nothing in the record to indicate any bias under Article 671 to warrant recusal of the trial judge. Therefore, we find that the motion to recuse was properly denied.

ASSIGNMENT OF ERROR NUMBER FOURTEEN
The defendant claims the trial court erred in denying his motion for an *729 independent medical examination of the victim prior to sentencing. The defendant claims that an independent medical examination would have demonstrated the child's current physical condition, which was relevant for sentencing because the trial judge had stated that the child's medical condition was the main reason that she intended to impose a maximum sentence. The State responds that the trial judge did not abuse her discretion in refusing to order a medical exam of the child.
Prior to sentencing, the defendant filed a motion seeking a medical examination of Christopher for sentencing purposes. In the motion, the defendant alleged that the trial court had made statements to the effect that the child was entirely incapacitated, whereas the defendant had learned that the child had regained much of his ability to function normally. The defendant claimed that the child's current medical status was relevant to sentencing.
After a hearing on the motion, (which was held immediately after the hearing on the motion for new trial), the trial judge denied the request, stating that she had heard from three separate doctors with regard to the child's initial injuries, his current condition, and his prognosis for the future.
This assignment of error by the defendant contains no citation to any legal authority, much less any authority for the proposition that the victim of child abuse should be compelled to undergo additional medical examination or testing. In State v. Gerhart, 583 So.2d 843 (La.App. 5 Cir. 1991), this Court held that the trial judge did not err in denying the defendant's request for an independent medical examination of a child sex abuse victim and rejected the defendant's claim that his right to present a defense was abridged by the lack of an independent medical examination. The Gerhart court noted that the child had been examined by a physician accepted by the trial court as an expert in pediatrics and child sexual abuse, who testified at trial. Further, the court noted that the defendant "merely sought an independent medical examination to perhaps obtain a more favorable result concerning the cause of the victim's injury." Id. at 845.
Although Gerhart is not directly on point, since the asserted purpose for the medical exam here was for sentencing, not to put on a defense, we find the Gerhart case to be instructive. As in Gerhart, the defendant herein has not demonstrated any prejudice in the trial court's denial of his motion for an independent medical examination of the victim. Further, it is reasonable to infer that the defendant herein, as was the case in Gerhart, merely sought the medical examination to obtain a more favorable result concerning the severity of Christopher's injuries. In addition, the record contains ample evidence of Christopher's condition as of the time of trial in December 2004, only a few months before the sentencing in March of 2005.
Considering the foregoing, we find that the trial judge did not err in denying the motion for a medical examination of the child abuse victim in this case.

ASSIGNMENT OF ERROR NUMBER FIFTEEN
The defendant contends that the trial judge erred in denying his motion to reconsider sentence and that his maximum 40-year sentence is excessive. Specifically, the defendant asserts, as he did in his motion to reconsider, that the defendant did not intend to hurt the child; that the trial judge failed to take into consideration the defendant's exemplary record as a citizen and the fact that he was a first offender; and that the sentence is out of line with similar crimes. The State responds *730 that the record supports the trial judge's imposition of the maximum sentence.
Initially, we note that the defendant requests this Court to supplement the record with the transcript of October 27, 2003, when his guilty plea was withdrawn. The defendant claims that the transcript is relevant because it reveals that the proposed sentence was either ten or twelve years and that a pre-sentence investigation report was considered in 2003.
We do not find it necessary to supplement the record with the transcript. The record contains ample evidence showing the existence of the plea agreement. It shows that the defendant agreed to plead guilty in exchange for a sentencing cap of 10 years and that the defendant could withdraw his plea if the trial judge refused to grant probation and to accept his plea under LSA-C.Cr.P. art. 893.
However, the trial judge was not required to consider the fact that the defendant withdrew his plea agreement. See, State v. Smith, 407 So.2d 652, 657 (La. 1981), "the fact that defendant did not accept a plea bargain is not a factor listed in La.C.Cr.P. art. 894.1." Accordingly, we find it is not necessary to supplement the record of the defendant's withdrawn guilty plea.
Turning to the discussion of the defendant's sentence, the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La.1992).
In reviewing a sentence for excessiveness, the reviewing court must consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice, recognizing at the same time the wide discretion afforded the trial judge in determining and imposing the sentence. State v. Allen, 03-1205 (La. App. 5 Cir. 2/23/04), 868 So.2d 877, 879.
In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Allen, 868 So.2d at 880. The trial judge is afforded wide discretion in determining a sentence, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed, even when the trial judge does not provide reasons for the sentence. State v. Uloho, supra 875 So.2d at 933.
Second degree cruelty to a juvenile is defined as "the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child." LSA-R.S. 14:93.2.3(A)(1). "Serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death. LSA-R.S. 14:93.2.3(A)(2). The penalty for second degree cruelty to juveniles is imprisonment at hard labor for not more than forty years. LSA-R.S. 14:93.2.3(C).
After a lengthy sentencing hearing where numerous witnesses testified, the trial judge stated as follows:
THE COURT:

*731 The Trial of this case took basically a week. There was an extensive amount of testimony. The Defendant testified at Trial, was Cross-examined (sic). And since the Defendant chose to put on a defense, the Court may appropriately assume that the Defendant put on the defense that they intended the trier of fact, that being a jury of twelve, to hear.
The court then discussed the testimony of the witnesses who spoke at the sentencing hearing. These witnesses included the defendant's former girlfriend, Misty Luminais, who said that Christopher was not with the defendant when he brought Rochelle home on the day of the injury. Both Ms. Luminais and her mother, Janet, testified that the defendant was a good father to Rochelle. Angelle and Roy Galliano, Jr., the defendant's brother and sister-in-law, testified as well. Angelle testified that the defendant was passive and that she trusted the defendant with her own child. Her husband and his siblings grew up in an abusive household. Roy elaborated that his mother told him that his father had pled guilty to sexually abusing one of his sisters. Roy claimed that his father was the person who hurt the child, and the defendant perjured himself to protect his father.
Micha Galliano, the defendant's new wife, testified that she and Joe were married in October of 2005, and that they had a nine-month-old son. She testified that the defendant was very caring. She also said that the defendant was afraid of his father, who physically and sexually abused the defendant when he was a child.
The defendant also testified at the hearing. When asked if he wanted to address the court before sentencing, he said, "if anything happened to Christopher, I don't feel that I done it." He echoed Roy's comments regarding the abuse and control his parents had over the household when they were children. When the prosecutor asked about his testimony in which he admitted shaking the child, the defendant said he did not shake the child "like they're making out." Then, he denied shaking the child at all, and said that he lied under oath at trial. Further, he explained that the child's injury could have occurred at his father's, since he had just he picked the child up from his father's house right before the child went into a coma. The defendant said he didn't testify to these facts because he forgot that his father had the child that day. He acknowledged that his father did not break the child's leg or close the car door on the child's head. The child's grandfather, James Cook, also made a statement regarding the child's current condition.
After referencing LSA-C.Cr.P. art. 894.1, the trial judge stated:
In this case the victim in this case, Christopher, was a happy healthy normal toddler. Joe Galliano admitted to shaking the baby. Immediately thereafter the baby sustained a seizure. The Defendant now alleges that the child was in the company of his father some hours earlier. The seizure however-even assuming something happened earlierthe seizure occurred immediately after Joe Galliano had the child. The child is now basically retarded. The child was expected to die. The injuries being so severe that the Homicide Division, rather than the Personal Violence Division, investigated this crime. The child has undergone multiple surgery (sic). The child had a stint (sic) in his brain. The child is cross-eyed. The child will require further surgery. The child is in Special Ed. The child will have occupational and Physical Therapy for the rest of his life. The child will never have the ability to participate *732 as a fully functioning child, adolescent, teen or adult.
The Sentence (sic) in this case is forty years at hard labor.
We find the record in this case reflects that the trial judge considered the nature of the offense and the circumstances of the offender, including that he was a first offender and his reputation as citizen. There is no requirement that specific matters be given any particular weight at sentencing. State v. Tracy, 02-0227 (La.App. 5 Cir. 10/29/02), 831 So.2d 503, 516, writ denied, 02-2900 (La.4/4/03), 840 So.2d 1213.
We further find that the record reflects that the trial judge imposed a severe sentence because she likened the circumstances of this case to attempted murder. A review of the jurisprudence supports the trial judge's statement. There are approximately twelve reported Louisiana cases in which criminal charges were filed where the victims' injuries were consistent with Shaken Baby Syndrome. The children who were the victims of these crimes lived in only ten of these cases.[15]
The court in State v. Hutcherson, infra, held that a nearly maximum sentence was not excessive, even though the victim did not die. Specifically, the court held that a 15-year-sentence, which was three-fourths of the maximum, was not excessive for the defendant convicted of attempted manslaughter after shaking and hitting his five-month-old daughter. Id., 785 So.2d at 148-149. The court pointed out that the child was alive "only because of the heroic efforts of her doctors." Id., 785 So.2d at 149.
The Louisiana Supreme Court in State v. Jones, 99-2207 (La. 1/29/01), 778 So.2d 1131, recognized that the legislature's addition of second degree cruelty to juveniles in 1999 reflected "the seriousness with which the legislature requires courts to consider the criminal neglect of children which produces serious bodily injury or significant neurological consequences even when that conduct does not bring about the death of the child." Id. at 1134. In Jones, the Supreme Court held that the court of appeal erred in setting aside the defendant's 20-year sentence on his manslaughter plea arising out of the death of his 22-month-old daughter. Although the defendant inflicted none of the injuries on his daughter in a pattern of abuse begun by the mother, the trial court found that the defendant's deliberate decision not to seek medical attention for victim contributed to neurological crisis which ultimately took her life. Id. at 1134.
The Jones court relied on the sentencing range of second degree cruelty when reviewing the defendant's sentence, because both second degree cruelty to juveniles and manslaughter were both punishable 40 years at hard labor. Although recognizing that another trial judge could have weighed the circumstances of the case differently, the Louisiana Supreme Court *733 stated that the question on review is not whether another sentence would have been more appropriate, but whether the trial court abused its broad sentencing discretion. Jones, 778 So.2d at 1133.
In the present case, we find the record contains evidence of the degree of force required to cause the child's injuries. Dr. Ellis acknowledged that the injuries could have been sustained from a blow to the head, but it would be along the lines of falling out of a three-story window and landing on one's head. He stated that the shaking required to cause these injuries is done in moments of rage, not play. According to Dr. Ellis, it would take a "fair amount of violence" to inflict the child's injuries, especially with a 2-year-old with good neck muscles.
Although the defendant was a first felony offender, the child was hospitalized with a fractured femur that occurred in the defendant's care. The child was returned to the defendant's household custody on October 30, 2001, and it was only two weeks later that the child was once again hospitalized, this time with life threatening injuries. Although the child did not die, we find the record supports the trial judge's finding that the child will never lead a normal life.
Maximum sentences are generally reserved for the most serious violators of the relevant statute, and for the worst type of offenders. State v. Carter, 04-482 (La. App. 5 Cir. 10/26/04), 888 So.2d 928, 938. While another judge might have weighed the circumstances in this case differently, the question on review is whether the trial judge abused her discretion, not whether another sentence might have been more appropriate. See, State v. Jones, supra. We find that the trial judge did not abuse her broad sentencing discretion by imposing a grossly disproportionate term of imprisonment. Therefore, defendant's sentence is affirmed.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990). One matter is presented for review. As noted by the State, the record reflects that the trial judge failed to notify the defendant of the prescriptive period for filing post-conviction relief. LSA-C.Cr.P. art. 930.8 provides that a defendant has two years from the day the judgment becomes final in which to file for post-conviction relief. Therefore, we remand the case, ordering the trial judge to send written notice to the defendant of the prescriptive period, along with a notice of when the period begins to run, within ten days of the rendering of its opinion, then to file written proof in the record that the defendant received the notice. See, State v. Lee, 02-0704 (La.App. 5 Cir. 12/30/02), 836 So.2d 589, 596, writ denied, 03-0535 (La. 10/17/03), 855 So.2d 755.
In accordance with the above, we affirm defendant's conviction of second degree cruelty to a juvenile and affirm his sentence of forty years imprisonment at hard labor.
AFFIRMED.
NOTES
[1] It is noted that defendant pled guilty as charged on August 23, 2003. The plea agreement provided a sentencing cap of 10 years, but also provided that the defendant could withdraw his guilty plea if the trial judge did not agree to probation after the pre-sentence investigation report was completed. The defendant withdrew his guilty plea on October 27, 2003.
[2] State v. Galliano, 02-K-1072 (La.App. 5 Cir. 10/25/02), unpublished. J. Cannella, J. Dufresne concurred, and J. Chehardy dissented.
[3] State v. Galliano, 02-2849 (La.1/10/03), 839 So.2d 932, per curiam, with C.J. Calogero dissenting.
[4] The child survived, but sustained numerous disabilities.
[5] It is noted that, at the time of trial, Stacy Cook was also known by her married name, Stacy Baham.
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[7] The record contains 19 photographs in an envelope that is marked as a State's proffer.
[8] The record reflects that the photos were originally on a CD containing demonstrative evidence. The court ruled that the demonstrative evidence on the CD could not be used at trial. The record reflects that Dr. Benton apparently burned the photos that were shown to the jury on another CD. It seems from the transcript that the CD was introduced for record purposes as S-32. According to the exhibit list, the CD is in the evidence room. An official request was prepared to have the record supplemented with the CD. The record was supplemented with the empty CD case. According to the district court, no CD was received with the case. Further, this Court received a copy of a letter from the prosecutor to the district court stating that the CD was never introduced.
[9] It is noted that the defendant also contends that the trial judge erred in denying his mistrial motion. As pointed out by the State, the record does not reflect that the defendant moved for a mistrial regarding Dr. Benton's testifying outside of his expertise.
[10] It is noted that Ms. Luminais testified on behalf of the defendant at the sentencing hearing, and stated that she was told by "the Attorney" . . . "that she would be a danger to the case because of the past Restraining Order."
[11] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."
[12] "Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required."
[13] LSA-R.S. 14:12 provides: "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances."
[14] See, State v. Conner, 02-363 (La.App. 5 Cir. 11/13/02), 833 So.2d 396, 408, writ denied, 02-3064 (La.4/25/03), 842 So.2d 396, which held that the introduction of inadmissible other crimes' evidence was harmless because it was cumulative and likely did not contribute to the verdict.
[15] State v. Glenn, 04-526 (La.App. 5 Cir. 3/1/05), 900 So.2d 26; State v. Smith, 04-199 (La.App. 5 Cir. 6/29/04), 877 So.2d 1123, writ denied, 04-2081 (La. 1/7/05), 891 So.2d 669; State v. Richthofen, 01-500 (La.App. 5 Cir. 11/27/01), 803 So.2d 171, writ denied, 02-0206 (La. 1/31/03), 836 So.2d 57; State v. Nolan, 04-360 (La.App. 3 Cir. 9/29/04), 882 So.2d 1246; State v. Douglas, 37,721 (La.App. 2 Cir. 12/10/03), 862 So.2d 390, writ denied, 04-0153 (La. 5/7/04), 872 So.2d 1080; State v. Neely, 35,993 (La.App. 2 Cir. 5/8/02), 818 So.2d 829; State v. Hutcherson, 34,540 (La. App. 2 Cir. 4/4/01), 785 So.2d 140; State v. Cushman, 94-336 (La.App. 3 Cir. 11/2/94), 649 So.2d 639, writ denied, 95-2045 (La. 3/7/97), 689 So.2d 1370; State v. McCants, 93-1703 (La.App. 1 Cir. 10/7/94), 644 So.2d 752; State v. Roy, 502 So.2d 265 (La.App. 2 Cir. 1987), writ denied, 506 So.2d 110 (La. 1987); State v. Bolden, 501 So.2d 942 (La.App. 2 Cir. 1987),